MICHAEL J. BIDART #60582
RICARDO ECHEVERRIA #166049
**SHERNOFF BIDART**
**DARRAS ECHEVERRIA, LLP**
600 South Indian Hill Boulevard
Claremont, CA 91711
Telephone: (909) 621-4935
Facsimile: (909) 625-6915

Attorneys for Defendant & Cross-Complainant, GREKA OIL & GAS, INC.

FILED
CLERK, U.S. DISTRICT COURT
AUG 10 2009
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

RECEIVED BUT NOT FILED
AUG 10 2009
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION
BY DEPUTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

VINTAGE PETROLEUM, LLC, a limited liability company under the law of the State of Delaware,

Plaintiff,

vs.

AMERICAN INTERNATIONAL SPECIALITY LINES INSURANCE, an Illinois Corporation; GREKA OIL & GAS, INC., A Colorado Corporation doing business under the laws of the State of California, DOES 1 through 20, inclusive,

Defendants.

GREKA OIL & GAS, INC.,

Cross-Complainant,

vs.

AMERICAN INTERNATIONAL SPECIALITY LINES INSURANCE,

Case No.: CV 09-02628-DDP-(SSx)
[Hon. Judge Dean D. Pregerson – Courtroom 3]

**FIRST AMENDED CROSS-COMPLAINT AND DEMAND FOR JURY TRIAL:**

1. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

2. BREACH OF CONTRACT

Complaint Filed: August 27, 2008

SHERNOFF BIDART DARRAS ECHEVERRIA LAWYERS FOR INSURANCE POLICYHOLDERS

ORIGINAL

an Illinois Corporation; and, DOES 1 through 20, inclusive,

Cross-Defendants.

**INTRODUCTION**

1. GREKA OIL & GAS, INC. (hereinafter "GREKA"), brings this First Amended Cross-Complaint against its liability insurer, AMERICAN INTERNATIONAL SPECIALITY LINES INSURANCE COMPANY (hereinafter "AISLIC"), for refusing to pay defense fees and costs owed to GREKA under the Policy in lawsuits which were was brought against GREKA and VINTAGE PETROLEUM, LLC (hereinafter, "Vintage") by Wells Fargo and Basin Partners.

2. GREKA has tendered approximately $1.4 million in defense fees and costs in both the Wells Fargo Lawsuit and the Basin Partners Lawsuit to AISLIC.

3. AISLIC has paid $294,161.24 for the reimbursement of defense fees and costs that GREKA paid in the Wells Fargo Lawsuit. After applying the $100,000 deductible per the Policy, AISLIC sent a reimbursement check to GREKA on September 3, 2008, in the amount of $194,161.24.

4. After having worked over three years on the defense, settlement and indemnity issues, AISLIC filed a Declaratory Relief Action, entitled *American International Specialty Lines Insurance Company v. Greka Oil & Gas, Inc. and Vintage Petroleum, LLC* (United States District Court, Case No. 08-cv-7591) (hereinafter the "Declaratory Relief Action"). AISLIC is seeking declaratory relief based upon its allegations that there was no coverage for the claims asserted in the Wells Fargo Lawsuit, and is also seeking to rescind the Policy.

5. AISLIC takes the position that GREKA responded "NO" to an inquiry on its application for insurance requesting whether GREKA knew of

SHERNOFF BIDART DARRAS ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

any facts which may result in claim or claims being asserted against them for environmental cleanup costs. AISLIC takes this position after having accepted the defense of GREKA in regards to these claims and after having reimbursed approximately $194,161.24 to GREKA for defense costs.

6. The allegations made on behalf of AISLIC in the Present Declaratory Relief Action are wrong and unreasonable. GREKA was unaware of any environmental contamination on the Cat Canyon Property at the time it completed its insurance application with AISLIC and any discovery of contamination became known to GREKA within the Policy period.

7. AISLIC's allegations that GREKA was not covered under its Policy are further unreasonable pursuant to Coverage A of the AISLIC Policy under the sub-heading "On-Site Clean-Up of Pre-Existing Conditions," AISLIC agreed to pay on behalf of GREKA any costs which resulted from pollution conditions that had commenced prior to June 26, 2002 (inception of Policy) if such pollution conditions were discovered during the Policy Period.

8. Also under Coverage A, AISLIC agreed to pay on behalf of GREKA indemnity and defense expenses that they became legally obligated to pay as a result of claims for clean-up costs resulting from pollution conditions that had commenced prior to June 26, 2002, provided that any such claim was made against GREKA during the Policy Period.

9. AISLIC owed GREKA a duty of good faith and fair dealing. AISLIC further owed GREKA a duty to defend in both the Wells Fargo Action and the Basin Partners Action if any of the allegations against GREKA were potentially within the policy coverage, AISLIC owed a duty to defend GREKA in its entirety. AISLIC now fails and refuses to reimburse

SHERNOFF BIDART DARRAS ECHEVERRIA LLP LAWYERS FOR INSURANCE POLICYHOLDERS

defense fees and costs which are due and owed to GREKA under the Policy.

10. In connection with the Wells Fargo Suit, AISLIC further fails and refuses to indemnify GREKA for settlement which has left GREKA exposed to a subsequent judgment.

11. GREKA now seeks damages resulting from AISLIC's breach of its implied covenant of good faith and fair dealing owed to GREKA under the Policy.

**PARTIES**

12. GREKA is now and at all times relevant herein was, a corporation organized and existing under the laws of the State of Colorado, and is registered to do business, and is conducting business, in the State of California, with its principal business office in Santa Maria, Santa Barbara County, California.

13. GREKA is informed and believes, and thereon alleges, that cross-defendant AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY (hereinafter "AISLIC") is an Illinois corporation which does business in all fifty states, with its principal place of business in New York, New York. For the purposes of this cross-complaint, any reference to AISLIC includes a reference to any entity acting on behalf of AISLIC, such as American International Group, Inc. (hereinafter "AIG").

14. Cross-Complainant believes and thereon alleges that at all times mentioned herein, each of the cross-defendant were the agents, employees and partners of each of the remaining defendants, and were acting within the scope and authority of such agency, employment and partnership, and with the knowledge, consent, approval, and ratification of remaining cross-defendants.

15. Whenever these cross-complainant reference acts of any

SHERNOFF BIDART DARRAS ECHEVERRIA LLP LAWYERS FOR INSURANCE POLICYHOLDERS

cross-defendant or cross-defendants, such allegation shall be deemed to mean the act of those cross-defendants named in the particular causes of action and each of them acting, individually, jointly and severally.

16. The true names and capacities, whether individual, corporate, associate, or otherwise, of cross-defendants and DOES 1 through 100, inclusive, are unknown to cross-complainant, who therefore sues said cross-defendants by such fictitious names. Cross-Complainant is informed and believes and thereon alleges that each of the cross-defendants designated herein as a DOE is legally responsible in some manner for the events and happenings referred to herein and legally caused injury and damages proximately thereby to cross-complainant. Cross-Complainant will seek leave of this Court to amend this cross-complaint to insert their true names and capacities in place and instead of fictitious names when they become known to cross-complainant.

SHERNOFF BIDART DARRAS ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

## FACTUAL BACKGROUND

17. Vintage was the lessee of three oil and gas leases known as the "Cat Canyon Leases" (hereinafter "Cat Canyon Property") and certain scheduled oil and gas leases in the Clark Avenue Field (hereinafter "Clark Avenue Field").

18. Pursuant to an Asset Sale Agreement (hereinafter "Agreement") entered into as of May 31, 2001, Vintage sold certain of its holdings, and assigned the Cat Canyon Property and the Clark Avenue Field to GREKA. Attached as Exhibit "1" to this first amended cross-complaint is a true and correct copy of the Agreement, and incorporated herein by reference.

19. The Agreement required GREKA to obtain insurance coverage to assure the performance of its obligations relating to the Cat Canyon Property and the Clark Avenue Field. The insurance coverage was

SHERNOFF BIDART DARRAS ECHEVERRIA LLP LAWYERS FOR INSURANCE POLICYHOLDERS

required to have policy limits of $10,000,000.00, which premiums were to be pre-paid by GREKA over a period of five years, naming Vintage as an additional insured. This insurance coverage was required to be primary to any other insurance held by Vintage.

**A. The AISLIC Policy**

20. Pursuant to the Agreement, GREKA turned to AISLIC to obtain the insurance coverage required. GREKA applied for the AISLIC Policy by completing a Pollution Legal Liability Application and a Cleanup Cost Cap Insurance Application on December 19, 2001. Attached as Exhibit "2" to this first amended cross-complaint is a true and correct copy of the Application, and incorporated herein by reference.

21. The AISLIC Policy number 8087804 (hereinafter "Policy") was issued by AISLIC to GREKA for the period of June 26, 2002 to June 26, 2007.

22. The Policy included a limit of $10 million per incident with a deductible of $100,000 per each incident. Attached as Exhibit "3" to this first amended cross-complaint is a true and correct copy of the Policy, and incorporated herein by reference.

23. Under Endorsement No.2 of the Policy, AISLIC describes the "Additional Insured(s) Endorsement" naming Vintage as an insured in addition to GREKA and covered under the Policy as follows:

> "1. Solely to the additional insured's liability arising out of the Named Insured's ownership operation, maintenance or use of the Insured Property(s) and
>
> 2. Only if the additional insured is named in a suit as a co-defendant with the Named Insured, alleging the additional insured is liable on the basis described in paragraph 1 above."

24. Under Coverage "A" of the Policy, AISLIC describes the "On-site Clean-Up of Pre-Existing Conditions" under the Policy as follows:

"1. **To pay on behalf of the Insured, Clean-Up Costs resulting from Pollution Conditions on or under the Insured Property that commenced prior to the Continuity Date**, if such Pollution Conditions are discovered by the Insured during the Policy Period, provided:

(a) **The discovery of such Pollution Conditions is reported to the Company in writing as soon as possible after discovery by the Insured and in any event during the Policy Period** in accordance with Section III of the Policy.

Discovery of Pollution Conditions happens when a responsible Insured becomes aware of Pollution Conditions.

(b) Where required, such Pollution Conditions have been reported to the appropriate governmental agency in substantial compliance with applicable Environmental Laws in effect as of the date of discovery." (Emphasis in original)

25. Under Coverage "B" of the Policy, AISLIC describes the "On-Site Clean-Up of New Conditions" under the Policy as follows:

"1. To pay on behalf of the Insured, Clean-Up Costs resulting from Pollution Conditions on or under the Insured Property that commenced on or after the Continuity Date, if such Pollution Conditions are discovered by the Insured during the Policy Period, provided:

(a) **The discovery of such Pollution Conditions is reported to the Company in writing as soon as possible after discovery by the Insured and in any event during the Policy Period** in accordance with Section III of the Policy.

Discovery of Pollution Conditions happens when a responsible Insured becomes aware of Pollution Conditions.

(b) Where required, such Pollution Conditions have been reported to the appropriate governmental agency in substantial compliance with applicable Environmental Laws in effect as of

SHERNOFF BIDART DARRAS ECHEVERRIA LLP LAWYERS FOR INSURANCE POLICYHOLDERS

the date of discovery." (Emphasis in original)

26. Under Coverage "C" of the Policy, AISLIC describes the "Third-Party Claims for On-Site Bodily Injury and Property Damage" under the Policy as follows:

> "To pay on behalf of the Insured, Loss that the Insured becomes legally obligated to pay as a result of the Claims for Bodily Injury or Property Damage resulting from Pollution Conditions on or under the Insured Property, if such Bodily Injury or Property Damage takes place while the person injured or property damages is on the Insured Property, provided such Claims are first made against the Insured and reported to the Company in writing during the Policy Period, or during the Extended Reporting Period if Applicable."

27. Under Coverage "K" of the Policy, AISLIC describes the "Known Pollutants" under the Policy as follows:

> **"To pay on behalf of the Insured, Clean-Up Costs in excess of the Self-Insured Retention that the Insured incurs for the Clean-Up of Pollutants identified in the Remedial Plan** (*defined as pollutants originated from the Cat Canyon Property which clean up occurred between June 26, 2002 and June 26, 2007*). For this coverage to apply:
>
> 1. The Named Insured must timely and routinely report the Clean-Up Costs to the Company prior to the Termination Date in accordance with Section IV paragraphs B.5; and,
> 2. **Clean-Up must occur on or after the Inception Date and before the Termination Date.**" (Emphasis in original)

28. Under Coverage "L" of the Policy, AISLIC describes the "Unknown Pollutants" under the Policy as follows:

> **"To pay on behalf of the Insured, Clean-Up Costs in excess of the Self-Insured Retention that the Insured incurs for the Clean-Up of Pollutants identified in the Remedial Plan.** For this coverage to apply:
>
> 1. The Pollutants must be first discovered pursuant to the

SHERNOFF BIDART DARRAS ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

execution of the Remedial Plan;

2. The Pollutants must originate from an Insured Property;

3. The Insured, must report, in accordance with Section IV. Paragraph B.4, the discovery of Pollutants different from those identified in the Remedial Plan to the Company as soon as practicable after discovery of such Pollutants and in any event included in the submission of the next scheduled Clean-Up Cost Progress Report and during the Policy Period;

4. The Named Insured must timely and routinely report the Clean-Up Costs to the Company prior to the Termination Date.

(Emphasis in original)

29. Under the Policy, GREKA was entitled to costs in excess of a $1,198,400 self-insured retention which GREKA incurred for the clean-up of pollutants identified in the remedial plan.

30. Cross-Complainant GREKA has paid all premiums due under the Policy and has otherwise performed and complied with all of its duties and obligations under the Policy, including, but not limited to, complying with the obligations set forth above.

**B. Covered Claims under AISLIC Policy**

31. On or about June 26, 2007, General Counsel for GREKA provided notice (as applicable, supplemental notice to previously noticed claims and/or possible claims) of pollution conditions, claims, pollutants, and possible claims pursuant to Article III of their Policy to AISLIC.

32. At that same time, GREKA further requested that AISLIC provide the claim number and the name of the handling adjustor for each of the claims and possible claims listed.

33. In their correspondence to AISLIC, GREKA fully complied with the notice obligations under the policy by advising their insurance carrier of

SHERNOFF BIDART DARRAS ECHEVERRIA LLP LAWYERS FOR INSURANCE POLICYHOLDERS

information pertaining to possible and/or active claims as such information became available to them. Both, the Cat Canyon and Clark Avenue Field claims were listed as possible claims covered under the AISLIC Policy. Attached as Exhibit "4" to this first amended cross-complaint is a true and correct copy of GREKA's letter dated June 27, 2007, and incorporated herein by reference.

34. On or about August 22, 2008, counsel for GREKA made a demand for policy limits, in consideration of past due and paid defense fees and costs, indemnification, and other issues previously tendered to AISLIC for payment. Attached as Exhibit "5" to this first amended cross-complaint is a true and correct copy of Attorney Garrison's letter dated August 22, 2008, and incorporated herein by reference.

SHERNOFF BIDART DARRAS ECHEVERRIA LAWYERS FOR INSURANCE POLICYHOLDERS

**I. The Wells Action**

35. On or about August 5, 2004, Wells Fargo Bank (hereinafter "Wells") filed suit against GREKA and Vintage in the Superior Court of California, County of Santa Barbara, *Wells Fargo Bank, N.A., v. Vintage Petroleum, Inc.*, Case No. 1155864 (hereinafter the "Wells Action").

36. The Wells Action was commenced by Wells and Union Bank as trustees. The trustees sought: (a) damages and other relief associated with environmental contamination on the Cat Canyon Property; and, (b) termination of the Cat Canyon Leases for failure to remedy several defaults under the terms of the Leases.

37. The trustees alleged that the assignment of the Leases required prior written consent from all trustees. The trustees further alleged that such consent was not obtained, and that the assignment was therefore terminated and required Vintage to restore and remediate the Cat Canyon Property. Such restoration and remediation included, but not limited, the plugging and abandonment of oil wells on the property, including any wells

that were not previously identified by Vintage prior to entering into their Agreement with GREKA. Lastly, the trustees alleged that pollution conditions at the Cat Canyon Property resulted in damage to the property owned by the trustees, including the loss of use of said property.

38. On or about February 8, 2005, Vintage tendered the Wells Action to AISLIC for defense and indemnity. On or about April 28, 2005, AISLIC accepted defense of the Wells Action and agreed to provide a full and complete defense to Vintage.

39. On or about March 22, 2005, GREKA tendered the Wells Action to AISLIC for defense and indemnity.

40. By way of letter dated December 1, 2005, AISLIC accepted defense of the Wells Action and agreed to provide a full and complete defense to GREKA. Said letter states as follows:

> "Based on our review of the facts and circumstances provided, please be advised that **AISLIC accepts defense of this claim under policy PLS/CCC 8087804** subject to a reservation of rights and the $100,000 deductible."

Attached as Exhibit "6" to this first amended cross-complaint is a true and correct copy of AISLIC's letter dated December 1, 2005, and incorporated herein by reference.

41. On or about April 13, 2005, GREKA retained counsel to defend both Vintage and GREKA in the Wells Action.

42. For approximately two and a half years after AISLIC accepted defense of the Wells Action, GREKA cooperated with their insurer and provided any and all assistance with the investigation and defense of their claim including but not limited to, producing voluminous document productions, providing extensive background and, meeting with representatives of AISLIC on numerous occasions in hopes of reaching a

SHERNOFF BIDART DARRAS ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

resolution in the Wells Action.

43. After having litigated the Wells Action for approximately two and a half years, counsel for GREKA began preparing for trial in June of 2008. GREKA repeatedly requested reimbursement for defense costs and submitted invoices which AISLIC failed to pay. Due to AISLIC's failure to reimburse the defense costs due under GREKA's, GREKA limited in defense resources during its preparation for trial.

44. On June 29, 2008, counsel for AISLIC advised Gregg Garrison, Esq., counsel for GREKA, that "Although it has been approximately two and one-half years since AISLIC accepted the defense of this action; AISLIC had never been provided with a substantive analysis from defense counsel concerning GREKA's potential exposure for liability and damages." In the same letter counsel for AISLIC states the following:

> "While we may differ as to whether potential coverage is "indisputable," that fact is that **AISLIC accepted the defense of the action no later than December of 2005. AISLIC is and has been providing a full and complete defense to GREKA.**" (Emphasis in Original)

Attached as Exhibit "7" to this first amended cross-complaint is a true and correct copy of Attorney McCurdy's letter dated July 29, 2008, and incorporated herein by reference.

45. AISLIC further states that it had received limited information from GREKA, which it claimed was part of the reason it had not reimbursed defense costs. However, GREKA had provided AISLIC with every document and/or status report requested and had made any and all information AISLIC requires clear and available to it.

46. On August 14, 2008, counsel for GREKA tendered to AISLIC approximately $357,887.06 in defense costs associated with the Wells

SHERNOFF BIDART DARRAS ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

Action for reimbursement. GREKA demanded immediate payment of these defense costs, which counsel for AISLIC had previously agreed to pay in its July 29, 2008 letter. Attached as Exhibit "8" to this first amended cross-complaint is a true and correct copy of Attorney Garrison's letter dated August 14, 2008, and incorporated herein by reference.

47. On August 15, 2008, counsel for GREKA made a second request to AISLIC for reimbursement of preexisting tendered defense costs fees and costs and tendered an additional $52,171.00 in defense fees and costs associated with the Wells Suit for reimbursement. Attached as Exhibit "9" to this first amended cross-complaint is a true and correct copy of Attorney Garrison's letter dated August 15, 2008, and incorporated herein by reference.

48. On or about August 20, 2008, after having engaged in trial, GREKA reached a settlement in the Wells Action which called for $5 million to be paid by GREKA to the trustees in the Wells Action. Not only was AISLIC continuously involved in reaching the settlement of the Wells Action, its counsel also attended the trial.

49. On August 27, 2008, counsel for GREKA demanded that AISLIC indemnify the settlements in the Wells Action and pay the past due and owing defense costs. As of August 27, 2008, the total defense costs accrued in the Wells Action were approximately $1,231,902.07. Attached as Exhibit "10" to this first amended cross-complaint is a true and correct copy of Attorney Garrison's demand letter, and incorporated herein by reference.

50. On September 2, 2008, counsel for GREKA again demanded that AISLIC pay an additional $8,973 in defense fees and costs in the Wells Action. As of that date, the total defense costs accrued in the Wells Action were approximately $1,405,901.28. Attached as Exhibit "11" to this first

SHERNOFF BIDART DARRAS ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

SHERNOFF BIDART DARRAS ECHEVERRIA LAWYERS FOR INSURANCE POLICYHOLDERS

amended cross-complaint is a true and correct copy of Attorney Garrison's September 2, 2008, demand letter, and incorporated herein by reference.

51. On September 5, 2008, counsel for GREKA demanded that AISLIC pay an additional $60,879.17 in defense fees and costs in the Wells Action. As of that date, the total defense costs accrued in the Wells Action were approximately $1,422,988.79. Attached as Exhibit "12" to this first amended cross-complaint is a true and correct copy of Attorney Garrison's September 5, 2008, demand letter, and incorporated herein by reference.

52. As of September 2008, contrary to its position in this action that there is no coverage, AISLIC has paid approximately $194,161 for reimbursement of defense fees and costs relating to the Wells Action. To date, AISLIC has unreasonably failed to fund the full settlement and failed to reimburse the remaining defense fees and costs in both the Wells Action and Basin Partners Action to its insureds.

**II. Basin Partners Action**

53. Basin Partners, LLC and Basin Investments, LLC filed suit on or about January 13, 2005, against GREKA and several other defendants asserting quiet title claims, damages for breach of contract, nuisance and trespass, and a claim for injunctive relief seeking abatement of the alleged nuisance ("Basin Partners Action").

54. This claim arose out of a dispute as to the validity of certain oil and gas rights together with related leases, agreements, easements and rights of way in an area of Santa Maria commonly referred to as the Clark Avenue Field, and responsibility of the Clark Avenue Field.

55. As a result of GREKA and Vintage's joint defense, a settlement was reached in the Basin Partners Action on November 15, pursuant to which GREKA purchased from Basin Partners, LLC and Basin Investments, LLC certain of their interest in the Clark Avenue Field for

approximately $14,000.00.

56. On November 25, 2008, counsel for GREKA submitted defense fees and costs to AISLIC for reimbursement in the Basic Partners Litigation. The total fees and costs in the defense of GREKA and Vintage totaled approximately $241,123. Attached as Exhibit "13" to this first amended cross-complaint is a true and correct copy of Attorney Garrison's November 25, 2008, demand letter, incorporated herein by reference.

57. On December 22, 2008, counsel for GREKA sent a letter confirming that AISLIC had accepted the defense of GREKA and Vintage in both the Wells Fargo and Basin Partners Litigation and owed GREKA a duty to reimburse the defense costs which had previously been tendered. Attached as Exhibit "14" to this first amended cross-complaint is a true and correct copy of Attorney Garrison's letter to AIG, incorporated herein by reference.

**C. AISLIC Files the Declaratory Relief Action**

58. On August 27, 2008, AISLIC filed its complaint in the Declaratory Relief Action, seeking an order that there is no coverage for the Wells Action under the Policy and that AISLIC owes no duty to defend and/or indemnify GREKA in connection with the Wells Action. Attached as Exhibit "15" to this first amended cross-complaint is a true and correct copy of AISLIC's complaint in the Declaratory Relief Action, and incorporated herein by reference.

59. AISLIC accepted the defense of GREKA without any reservation of rights and now alleges that GREKA failed to disclose the environmental contamination that existed on the Cat Canyon Property prior to the effective date of the AISLIC Policy. AISLIC further alleges that had GREKA disclosed the environmental contamination prior to the inception of the Policy, AISLIC would not have issued the AISLIC Policy.

SHERNOFF BIDART DARRAS ECHEVERRIA LAWYERS FOR INSURANCE POLICYHOLDERS

60. AISLIC's allegations are without merit because GREKA did not fail to disclose any environmental contamination which existed on the Cat Canyon Property to AISLIC nor did GREKA misrepresent any material facts relating to any potential risk AISLIC was to insure.

61. GREKA became aware of all contaminations after the inception of the Policy. As was required under the Policy, GREKA made AISLIC aware of any and all claims upon learning of same.

62. Under Coverage "A" of GREKA's AISLIC Policy it states that AISLIC will pay any costs resulting from Pollution Conditions which commenced prior to the inception of the Policy as long as these conditions were discovered during the Policy period. GREKA was unaware of any environmental contaminations at the time of applying for insurance with AISLIC and, since the discovery of the contamination was during the Policy period, AISLIC's claim that there is no coverage is unreasonable.

63. Further, AISLIC's allegations lack merit because the Declaratory Relief Action was filed after AISLIC had already accepted the defense of GREKA without any reservation of rights and had already paid a portion of defense fees to its insured.

64. On or about August 28, 2008, AISLIC by way of email informed counsel for GREKA that GREKA would receive reimbursement for the reasonable and necessary defense fees and costs no later than September 5, 2008.

65. Despite its previous acknowledgment that coverage existed under the Policy for GREKA without a reservation of rights, AISLIC now reserves its position and seeks a declaration that there is no coverage for defense and indemnity and seeks to rescind the Policy making it null and void.

SHERNOFF BIDART DARRAS ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

SHERNOFF BIDART DARRAS ECHEVERRIA LAWYERS FOR INSURANCE POLICYHOLDERS

## FIRST CAUSE OF ACTION

**(Breach of the Implied Covenant of Good Faith And Fair Dealing)**

CROSS-COMPLAINANT GREKA OIL & GAS, INC., FOR A FIRST CAUSE OF ACTION AGAINST CROSS-DEFENDANTS AMERICAN INTERNATIONAL SPECIALITY LINES INSURANCE, and DOES 1 THROUGH 20, INCLUSIVE, FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, ALLEGES:

66. Cross-Complainant alleges and incorporates by reference paragraphs 1 through 65 of this first amended cross-complaint in support of this claim for relief.

67. Cross-Defendants have breached their duty of good faith and fair dealing owed to cross-complainant in the following respects:

(a) Unreasonably and in bad faith failing and refusing to tender the defense costs associated with the Wells Action and Basin Partners Action despite several opportunities and demands to do so;

(b) Unreasonably and in bad faith delaying, failing and refusing to indemnify its insured for the settlement of the Wells Action and Basin Partners Action, which was within policy limits, despite several opportunities and demands to do so;

(c) Unreasonably and in bad faith maintaining a coverage position that was not supported by the facts or California law;

(d) Unreasonably and in bad faith failing to give at least as much consideration to GREKA's interests in the handling of the claim as they gave to their own interests;

(e) Unreasonably and in bad faith failing to properly investigate the claim by failing to diligently search for evidence that could support payment of the claim;

SHERNOFF BIDART DARRAS ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

(f) Unreasonably and in bad faith exposing cross-complainant to the possibility of causing substantial harm to its good name and reputation because of cross-defendants' failure to promptly fund the settlement in the Wells Action, which was within policy limits, despite several opportunities and demands to do so.

(g) Unreasonably and in bad faith seeking rescission of the policies it has issued to cross-complainant without ever tendering a return of premiums.

68. Cross-Complainant is informed and believes and thereon alleges that cross-defendants have breached the implied covenant of good faith and fair dealing under the Policy by other acts or omissions of which cross-complainant is presently unaware and which will be shown according to proof at the time of trial.

69. As a proximate result of the unreasonable and bad faith conduct of cross-defendants AISLIC and DOES 1 through 20, and each of them, cross-complainant has suffered, and will continue to suffer in the future, damages under the policy, plus interest and other economic damages, for a total amount to be shown at the time of trial.

70. As a further proximate result of the unreasonable and bad faith conduct of cross-defendants AISLIC and DOES 1 through 20, and each of them, cross-complainant was compelled to retain legal counsel to obtain the benefits due under the Policy. Therefore, cross-defendants AISLIC and DOES 1 through 20, and each of them, are liable to cross-complainant for those attorneys' fees reasonably necessary, and incurred and/or paid by cross-complainant in order to obtain benefits under the Policy in a sum to be determined at the time of trial.

71. As a further proximate result of the unreasonable and bad faith conduct of cross-defendants AISLIC and DOES 1 through 20, and each of

them, cross-complainant has suffered other consequential economic damages in a sum to be determined at the time of trial.

72. The cross-defendants' conduct described herein was intended by cross-defendants to cause injury to cross-complainant, or was despicable conduct carried on by the cross-defendants with a willful and conscious disregard of the rights of cross-complainant or subjected cross-complainant to cruel and unjust hardship in conscious disregard of the cross-complainant's rights, or was an intentional misrepresentation, deceit, or concealment of a material fact known to the cross-defendants with the intention to deprive cross-complainant of property or legal rights or to otherwise cause injury, such as to constitute malice, oppression or fraud under California Civil Code section 3294, thereby entitling cross-complainant to punitive damages in an amount appropriate to punish or set an example of cross-defendants.

73. Cross-Defendants' conduct described herein was undertaken by the corporate officers or managing agents of AISLIC, identified herein as DOES 1 through 20, inclusive, who were responsible for claims supervision and operation, underwriting, communications and/or decisions. The aforementioned conduct of these managing agents and individuals was therefore undertaken on behalf of AISLIC. Cross-complainant alleges on information and belief that AISLIC had advance knowledge of the actions and conduct of these individuals, and that their actions and conduct were ratified, authorized, and approved by managing agents whose precise identities are unknown to cross-complainant at this time and are therefore identified and designated herein as DOES 1 through 20, inclusive.

74. Cross-Defendants' unreasonable and bad faith conduct is the legal cause of the substantial harm and damage cross-complainant suffered, including general and special damages, interest, and other

SHERNOFF BIDART DARRAS ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

economic and consequential damages.

**SECOND CAUSE OF ACTION**

**(Breach of Insurance Contract)**

CROSS-COMPLAINANT GREKA OIL & GAS, INC., FOR A SECOND CAUSE OF ACTION AGAINST CROSS-DEFENDANTS AMERICAN INTERNATIONAL SPECIALITY LINES INSURANCE, AND DOES 1 THROUGH 20, INCLUSIVE, FOR BREACH OF CONTRACT, ALLEGES:

75. Cross-Complainant alleges and incorporates by reference paragraphs 1 through 74of this first amended cross-complaint in support of this claim for relief.

76. Cross-Defendants breached the terms and provisions of the Policy by failing to timely provide benefits owing under the Policy.

77. Cross-Defendants have breached the terms and provisions of the Policy owed to cross-complainant in the following respects:

(a) Unreasonably and in bad faith failing and refusing to tender the defense costs associated with the Wells Action and Basin Partners Action, despite several opportunities and demands to do so;

(b) Unreasonably and in bad faith failing and refusing to indemnify its insured for the settlement in the Wells Action and Basin Partners Action, which was within policy limits, despite several opportunities and demands to do so;

(c) Unreasonably and in bad faith maintaining a coverage position that was not supported by the facts or California law;

(d) Unreasonably and in bad faith failing to give at least as much consideration to GREKA's interests in the handling of the claim as they gave to their own interests;

(e) Unreasonably and in bad faith failing to properly investigate the

SHERNOFF BIDART DARRAS ECHEVERRIA LAWYERS FOR INSURANCE POLICYHOLDERS

claim by failing to diligently search for evidence that could support payment of the claim;

(f) Unreasonably and in bad faith exposing cross-complainant to the possibility of causing substantial harm to its good name and reputation because of cross-defendants' failure to promptly fund the settlement in the Wells Action, which was within policy limits, despite several opportunities and demands to do so.

(g) Unreasonably and in bad faith seeking rescission of the policies it has issued to cross-complainant without ever tendering a return of premiums.

78. Cross-Complainant is informed and believes and thereon alleges that cross-defendants have breached the terms and provisions of the Policy by other acts or omissions of which cross-complainant is presently unaware and which will be shown according to proof at the time of trial.

79. Cross-Complainant has complied with all of the terms and conditions of the Policy, including payment of all premiums due and any other costs associated with the Policy.

80. As a direct and proximate result of cross-defendants' conduct and breach of their contractual obligations, cross-complainant has suffered damages under the Policy in an amount to be determined according to proof at the time of trial, plus interest and other foreseeable and incidental damages according to proof, and in amounts to be determined at the time of trial.

SHERNOFF BIDART DARRAS ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

SHERNOFF BIDART DARRAS ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

**PRAYER FOR RELIEF**

WHEREFORE, cross-complainant prays for judgment against cross-defendants, and each of them, as follows:

**AS TO THE FIRST CAUSE OF ACTION AGAINST CROSS-DEFENDANTS AMERICAN INTERNATIONAL SPECIALITY LINES INSURANCE, and DOES 1 THROUGH 20, INCLUSIVE, FOR BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING:**

1. Damages for their failure to provide benefits under the Policy, plus interest, including pre-judgment interest, and other economic and consequential damages, in a sum to be determined at the time of trial;

2. For all economic damages proximately caused by cross-defendants' conduct;

3. For reasonable attorneys' fees, witness fees, and costs of litigation incurred and/or paid by cross-complainant to obtain the Policy benefits in an amount to be determined at trial;

4. Punitive and exemplary damages in an amount appropriate to punish or set an example of cross-defendants;

5. For costs of suit incurred herein; and

6. For such other and further relief as the Court deems just and proper.

**AS TO THE SECOND CAUSE OF ACTION AGAINST CROSS-DEFENDANTS AMERICAN INTERNATIONAL SPECIALITY LINES INSURANCE, and DOES 1 THROUGH 20, INCLUSIVE, FOR BREACH OF CONTRACT:**

1. Damages for failure to provide benefits under the Policy, plus interest, including pre-judgment interest, and other economic and consequential damages, in a sum to be determined at the time of trial;

2. For all economic damages proximately caused by cross-defendants' conduct;

3. For costs of suit incurred herein; and

4. For such other and further relief as the Court deems just and proper.

Date: August 4, 2009

SHERNOFF BIDART
DARRAS & ECHEVERRIA, LLP

By______________________
MICHAEL J. BIDART
RICARDO ECHEVERRIA
Attorneys for Defendant and Cross-Complainant

SHERNOFF BIDART DARRAS ECHEVERRIA LAWYERS FOR INSURANCE POLICYHOLDERS

**DEMAND FOR JURY TRIAL**

Defendant and Cross-Complainant hereby demands a trial by jury.

Date: August 4, 2009

SHERNOFF BIDART
DARRAS & ECHEVERRIA, LLP

By______________________________
MICHAEL J. BIDART
RICARDO ECHEVERRIA
Attorneys for Defendant and Cross-Complainant

SHERNOFF BIDART
DARRAS ECHEVERRIA LLP
LAWYERS FOR INSURANCE POLICYHOLDERS

# EXHIBIT "1"

## ASSET SALE AGREEMENT
## CAT CANYON, LOS FLORES, CLARK AVENUE, SANTA MARIA VALLEY AND ZACA FIELDS

1. Sale and Purchase of Assets
2. Closing
3. Effective Date
4. Transfer Date
5. Purchase Price and Manner of Payment
6. [Omitted]
7. Disposition of Accounts Receivable and Other Revenue
8. Proration of Credits and Payment Obligations
9. Proration of Real Estate and Other Taxes
10. Sales Tax and Use Taxes
11. Documentation of Sale and Transfer of Ownership
12. Conditions Precedent to Closing
13. Deliveries at Closing
14. Post-Closing Settlement
15. Title Matters
16. Buyers Acceptance of the Assets
17. Physical Condition of the Assets
18. Buyer's Investigation and Indemnification
19. Compliance
20. Indemnification and Assumption of Obligations
21. Indemnification and Assumption of Environmental Risks
22. Representations
23. Operation of the Assets Prior to Closing
24. Covenant Not to Sue and Alternative Dispute Resolution
25. Miscellaneous
26. Additional Plugging, Abandonment and Remediation Requirements
27. Security for Plugging and Abandonment
28. Casualty Losses

Exhibit A - Corporation Grant Deed
Exhibit B - Bill of Sale
Exhibit C - Assignment of Leases and Agreements
Exhibit D - Sublicense Agreement For Use Of OEC Technology
Exhibit E - Parent Company Guarantee
Exhibit F - Parent Company Confirmation
Exhibit G - Allocation of Value
Exhibit H - Claims and Litigation
Exhibit I - Preferential Rights to Purchase, First Rights of Refusal and Consents to Assign

Schedule 1.1(a) – Oil, Gas and Mineral Leases and Real Property
Schedule 1.1(e) – Applicable Contracts
Schedule 8(b) – Suspense Accounts
Schedule 15(c) – Working and Net Revenue Interests
Schedule 22(a)(x)(1) – Defaulted Leases

## ASSET SALE AGREEMENT

**Cat Canyon, Los Flores, Clark Avenue, Santa Maria Valley and Zaca Fields**

THIS AGREEMENT, made as of this 31st day of May, 2001, between **VINTAGE PETROLEUM CALIFORNIA, INC.**, an Oklahoma corporation ("Seller"), with a place of business at 110 West Seventh Street, Tulsa, Oklahoma 74119, and **GREKA SMV, INC.**, a Colorado corporation ("Buyer"), with a place of business at 3201 Airpark Drive, Suite 201, Santa Maria, CA 93455.

RECITALS

Seller desires to sell to Buyer and Buyer desires to purchase from Seller on the terms and conditions set forth in this Asset Sale Agreement ("Contract") those certain oil and gas interests, operating rights, real property, personal property, fixtures and improvements located on the real property and associated assets, identified herein. Accordingly, in consideration of the mutual promises contained herein, the mutual benefits to be derived by each party hereunder and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller agree as follows:

1. Sale and Purchase of Assets:

1.1 Assets To Be Sold: Seller shall sell, assign, transfer and convey to Buyer, and Buyer shall purchase and receive at "Closing" (as defined below) all of Seller's undivided right, title and interest (but exclusive of the equipment, machinery, and other real, personal movable, immovable and mixed property expressly reserved by Seller pursuant to Section 1.2 hereof and elsewhere herein) in and to the following:

a) the oil, gas, and mineral leases and real property recited and described in and on Schedule 1.1(a) ("Property") insofar and only insofar as same are contained therein and described;

b) all oil and gas wells, salt water disposal wells, injection wells and other wells on the Property(collectively the "Wells");

c) all equipment, machinery, fixtures, flowlines, roads, pipelines, pole lines, appurtenances, materials, improvements, and other real, personal, and mixed property located on, used in the operation of, or relating to the production, treatment, sale, or disposal of hydrocarbons, water, and associated substances produced from the Property including without limitation, the property recited and described in and on Exhibit B attached hereto and made a part hereof (the "Personal Property");

d) all hydrocarbons, including, natural gas, casinghead gas, drip gasoline, natural gasoline, natural gas liquids, condensate products, and crude oil, whether gaseous or liquid, produced from or allocable to the Property on or after the Effective Date (the "Hydrocarbons");

e) all contracts, permits, road use agreements, rights-of-way, easements, licenses, servitudes and agreements relating to the Property, Personal Property and Wells, or the ownership or operation thereof, or the production, treatment, sale, storage or disposal of hydrocarbons, water, or substances associated therewith recited and described in and on Schedule 1.1(e) (the "Applicable Contracts");

f) originals of all of the files, records, information and materials relating to the Property, Hydrocarbons, Applicable Contracts and Personal Property, owned by Seller and which Seller is not prohibited from transferring to Buyer by law or existing contractual relationship (collectively, the "Records"), including, without limitation: (i) lease, land and title records (including abstracts of title, title opinions, certificates of title, title curative documents, division orders, and division order files) (the "Land Files"), (ii) the Applicable Contracts, (iii) all environmental and production files (the "Production Files"), and (iv) original Well files;

g) the Sublicense Agreement For Use Of OEC Technology, attached hereto as Exhibit "D"; and

h) all geophysical, geological, engineering and other technical and interpretative data relating to the Assets including, without limitation, all such data and interpretations Seller or its affiliates acquired from Texaco Exploration and Production Inc. and from Shell Oil Company.

All such Property, Wells, Hydrocarbons, Applicable Contracts, Personal Property, Records, and Sublicense are hereinafter collectively referred to as the "Assets" and are intended by the parties to include all interests of Seller located in Santa Barbara, County, California (except for the California lease).

1.2 Exclusions and Reservations: Specifically excepted and reserved from this transaction are the following, hereinafter referred to as the "Excluded Assets".

a) Any of Seller's reserve estimates, economic analyses, pricing forecasts, legal opinions or analyses, or information considered by Seller as confidential or protected by "Attorney-Client Privilege";

b) All rights and claims arising, occurring, or existing in favor of Seller prior to the Effective Date including, but not limited to, any and all contract rights, claims, penalties, receivables, revenues, recoupment rights, recovery rights, accounting adjustments, mispayments, erroneous payments, personal injury, property damage, royalty or other rights and claims of any nature in favor of Seller relating to any time period prior to the Effective Date;

c) All corporate, financial, and tax records of Seller; however, Buyer shall be entitled to receive copies of any financial and tax records which directly relate to the Assets, or which are necessary for Buyer's ownership, administration, or operation of the Assets;

d) All rights, titles, claims and interests of Seller related to the Assets for all periods prior to the Effective Date (i) under any policy or agreement of insurance or indemnity, (ii) under any bond, or (iii) to any insurance or condemnation proceeds or awards;

e) All hydrocarbons produced from or attributable to Seller's interest in the Assets with respect to all periods prior to the Effective Date together with all proceeds from or of such hydrocarbons;

f) Claims of Seller for refund of or loss carry forwards with respect to (i) production, windfall profit, severance, ad valorem or any other taxes attributable to the Assets for any period prior to the Effective Date, (ii) income or franchise taxes attributable to the Assets for any period prior to the Effective Date;

g) All amounts due or payable to Seller as adjustments or refunds under any contracts or agreements affecting the Assets for all periods prior to the Effective Date;

h) All amounts due or payable to Seller as adjustments to insurance premiums related to the Assets for all periods prior to the Effective Date;

i) Subject to the terms hereof, all monies, proceeds, benefits, receipts, credits, income or revenues (and any security or other deposits made) attributable to the Assets prior to the Effective Date;

j) All Seller's patents, trade secrets, copyrights, names, marks and logos;

k) All software and software licenses; and

f) Vehicles.

2. Closing: Closing shall mean the date on which the Purchase Price (as defined below) is paid to Seller and the conveyancing instruments referred to in Paragraph 13 are delivered to Buyer. Closing shall occur at Seller's office, five business days after Buyer has delivered notice to Seller that it is ready to close, but in no event later than July 31, 2001at a mutually agreeable time.

3. Effective Date: The Effective Date of the sale shall be:

a. For Property without Consents, May 1, 2001, as of 7:00 a.m., PDT.

b. For any individual Property with a Consent requirement, 30 days prior to receipt of all of the Consents required for such individual Property.

4. Transfer Date: The Transfer Date shall be at 7:00 a.m. on the next ensuing day after Closing.

5. Purchase Price and Manner of Payment: Buyer shall pay to Seller, or its respective designee, as consideration for the Assets, a Purchase Price of Seventeen Million Seven Hundred Fifty Thousand Dollars ($17,750,000), as adjusted, plus interest, as hereinafter provided:

a. At Closing, Buyer shall pay to Seller the Purchase Price, as adjusted herein.

b. Buyer shall pay to Seller at Closing interest on the Purchase Price. Such interest shall be calculated at LIBOR (3 month rate) and shall be based upon the period beginning 30 days after the Effective Date and ending at the Closing (calculated separately for each individual Property); provided that no interest shall accrue during any period for which Seller's actions or omissions have caused a delay in Closing.

c. All amounts to be paid hereunder to Seller shall be paid by wire transfer of immediately available funds made payable to "Vintage Petroleum California, Inc." or its designee.

d. Seller may request no later than five (5) days prior to Closing, that Buyer bring additional funds to Closing for the reasonably estimated costs for filing fees, transfer taxes, sales and gross receipt taxes on the tangible personal property, and such other charges necessary to transfer the Assets. The Purchase Price shall be allocated among tangibles and intangibles comprising the Assets as follows: Ninety Percent (90%) of the Purchase Price shall be

attributed to the real property (15% attributable to real property surface and 85% attributable to real property oil and gas) and Ten Percent (10%) shall be attributed to the Equipment and other personal property. Buyer and Seller agree to be bound by the allocation of the Purchase Price among tangible and intangible Assets, set forth herein, for all purposes; to consistently report such allocations for all federal, state and local income tax purposes; and to timely file all reports required by the Internal Revenue Code of 1986, as amended, concerning the Purchase Price allocations. Buyer shall timely reimburse Seller for any and all charges paid by Seller over the estimated amount and Seller shall refund any excess amount to Buyer.

6. [Omitted]

7. Disposition of Accounts Receivable and Other Revenue: Accounts receivable or other revenue associated with the Assets, to the extent that such accounts receivable or revenue are attributable to times prior to the Effective Date, and oil in tanks above the pipeline connections and gas produced prior to such date shall not be part of the sale but shall remain the property of Seller. All storage tanks, if any, on the property subject to this Contract shall be gauged at 7:00 a.m. local time on the Effective Date. Buyer shall have the right to be present to witness such gauging; if Buyer elects not to be present, Buyer shall be deemed to have accepted the gauging as to quantity and gravity set at the gauging. Such gauging shall deduct reasonable and customary amounts for line-fill and tank bottoms necessary for operations. Seller and Buyer shall execute such additional documents as may be necessary to properly evidence the transfer of the interests herein sold and purchased. Seller shall have the right to enter upon the Assets to remove all oil and gas not sold herein within a reasonable time following Closing, or sell the same to Buyer at the highest posted field price for oil and Seller's gas sales contract price for gas prevailing in the field as of Closing.

8. Proration of Credits and Payment Obligations:

a. All credits and payment obligations associated with the Assets, including but not limited to royalties, lease rentals, and other forms of contractual payments shall be prorated between Seller and Buyer as of the Effective Date. Seller shall be responsible for all such items attributable to periods prior to the Effective Date or Closing, as applicable, and Buyer shall be responsible for and shall pay for all such items attributable to periods on and after such date. Buyer shall pay and be responsible for all sales, transfer, and use taxes, plus any penalty or interest thereon, applicable to the sale of the Assets.

b.    Notwithstanding paragraph 8.a., at Closing or such other time as Seller and Buyer agree, Seller shall deliver to Buyer all funds as an offset against Buyers payment to Seller as required in Paragraph 5.a., in an amount representing the value or proceeds of production removed or sold from the Assets and then held by Seller in accounts from which payments have been suspended and as disclosed on Schedule 8(b). Thereafter Buyer shall be solely responsible for the proper distribution of such funds, including any obligation under law to identify and locate the persons entitled to such funds and to report and escheat such funds under applicable state unclaimed property law.

c.    Seller shall retain all rights and obligations regarding outstanding receivables pertaining to the Assets which accrued to Seller prior to the Effective Date.

d.    Seller shall retain all rights and obligations regarding outstanding trade payables related to the Assets which accrued to Seller prior to the Effective Date.

e.    In accordance with generally accepted accounting principles, Seller shall complete a settlement statement accounting within 90 days of Closing pursuant to Paragraph 14.

9.    Proration of Real Estate and Other Taxes: All real estate, occupation, ad valorem, personal property, and severance taxes and charges on any of the Assets shall be prorated as of the Effective Date. Seller shall pay all such items for all periods prior to such date and shall be entitled to all refunds and rebates with regard to such periods. In the event Buyer pays additional taxes or charges which are assessed upon or levied against any of the Assets after Closing with respect to any period prior to the Effective Date, Seller shall promptly reimburse Buyer the amount thereof upon presentation of a receipt therefor. If Seller elects to challenge the validity of such assessment or levy, or any portion thereof, Buyer shall extend reasonable cooperation to Seller in such efforts, at no expense to Buyer. Buyer shall be responsible for the determination and payment of any sales tax or transfer tax due on the sale and purchase of any tangible personal property hereunder.

10.    Sales Tax and Use Taxes: Buyer shall be responsible for all sales, use, transfer and similar taxes arising out of the sale of the Assets. At Closing, Buyer shall pay Seller all state and local sales or use taxes applicable to that portion of the Assets which is tangible personal property, and Seller shall remit such amount to the appropriate taxing authority in accordance with applicable law. All recording and transfer fees shall be paid by Buyer.



Should this purchase and sale constitute an isolated or occasional sale and not be subject to sales or use tax with any of the taxing authorities having jurisdiction over this transaction, no sales tax will be collected by Seller from Buyer at the date of Closing. Seller agrees to cooperate with Buyer in demonstrating that the requirements for an isolated or occasional sale or any other sales tax exemption have been met.

11. Documentation of Sale and Transfer of Ownership: Subject to the terms of this Contract, the Assets to be conveyed by Seller to Buyer shall be conveyed "AS IS, WHERE IS" pursuant to the instruments substantially in the form of the Exhibits attached hereto and such other form or forms customary and necessary to properly transfer the Assets according to the requirements of any applicable federal, state or local agency. Buyer assumes the risk of description, title and condition of the Assets and shall satisfy itself with respect thereto.

a. Seller shall deliver the Assets to Buyer on the Transfer Date subject to the reservations, limitations, conditions and restrictions contained in this Contract and the instruments of conveyance attached hereto.

b. The title to the Assets shall be subject to all matters appearing of record or that can be ascertained by an inspection thereof and shall be conveyed to Buyer without any warranty of title, express or implied, except that Seller has not heretofore disposed of, burdened or otherwise encumbered, any interest herein offered for sale. The cost of title insurance, if any, shall be paid for by the party requesting it.

12. Conditions Precedent to Closing:

a. Seller's Conditions Precedent: Unless waived in writing on notice given not later than five (5) days prior to Closing, the obligations of Seller to consummate the transactions contemplated by this Contract are subject to each of the following conditions:

(i). Buyer shall have performed and complied with all terms of this Contract required to be performed or complied with by Buyer prior to Closing;

(ii). No action or proceeding by or before any governmental authority shall have been instituted or threatened (and not subsequently dismissed, settled or otherwise terminated) which might restrain, prohibit or invalidate any of the transactions contemplated by this Contract, other than an action or proceeding instituted or threatened by Seller or any of its affiliates;

(iii). Seller and Buyer shall have executed, delivered and acknowledged a bilateral form of assignment and a bilateral form of grant deed whereby Seller transfers its right, title and interest in the Assets to Buyer and Buyer assumes the obligations and liabilities pursuant to Paragraphs 20 and 21, hereof;

(iv). Buyer shall have provided Seller with a copy of the bond required by Section 3206 of the Public Resources Code of the State of California or other security acceptable to the State of California for wells which have not produced oil or gas or have not been used as injectors, for a period of five (5) years, not later than ten (10) days before Closing.

(v). The representations and warranties of Buyer contained in this Contract shall be true and correct in all material respects on the Closing Date as though made on and as of such date.

b. Buyer's Conditions Precedent: Unless waived in writing on notice given not later than five (5) days prior to Closing, the obligations of Buyer to consummate the transactions contemplated by this Contract are subject to each of the following conditions;

(i). Seller shall have performed and complied with all terms of this Contract required to be performed or complied with by Seller prior to Closing;

(ii). No action or proceeding by or before any governmental authority shall have been instituted or threatened (and not subsequently dismissed, settled or otherwise terminated) which might restrain, prohibit or invalidate any of the transactions contemplated by this Contract, other than an action or proceeding instituted or threatened by Buyer or any of its affiliates;

(iii). Seller and Buyer shall have executed, delivered and acknowledged a bilateral form of assignment and a bilateral form of grant deed whereby Seller transfers its right, title and interest in the Assets to Buyer, and Buyer assumes the obligations and liabilities pursuant to Paragraphs 20 and 21, hereof.

(iv). The representations and warranties of Seller contained in this Contract shall be true and correct in all material respects on the Closing Date as though made on and as of such date.

(v) All Consents shall have been obtained, waived or the time to exercise such rights have expired.

(vi) Vintage Petroleum Inc. ("Vintage") shall have transferred all of the Assets to Seller subject to all of the representations, warranties, and conditions (including the obtaining of all Consents from Vintage to Seller) described in this Agreement.

13. Deliveries at Closing:

a. Buyer shall deliver to Seller at or before Closing the following:

(i). the amount specified in Paragraph 5.a. above, as adjusted by this Contract;

(ii). a duplicate original notice to the Division of Oil, Gas and Geothermal Resources as required by Section 3202 of the Public Resources Code of the State of California including satisfactory evidence of indemnity bonds in amounts as provided in Section 3204 or 3205 or such other security acceptable to the State of California;

(iii). a certificate of insurance policy as further described in Paragraph 27 herein;

(iv). a duplicate original Parent Company Guarantee substantially identical to Exhibit "E"; and

(v). such other instruments or documents as Seller may reasonably request of Buyer to consummate the transaction contemplated herein.

b. Seller shall deliver to Buyer at Closing the following:

(i). a duplicate original Assignment of Oil and Gas Leases and Corporation Grant Deed, in the form of Exhibit "A", in favor of Buyer duly executed and acknowledged by Seller, the original of which will be recorded by Buyer at Buyer's expense; and

(ii). a duplicate original Bill of Sale, in the form of Exhibit "B", in favor of Buyer conveying the personal property located on the premises, duly executed by Seller; and

(iii). a duplicate original Assignment of Agreements, in the form of Exhibit "C", in favor of Buyer, duly executed and acknowledged by Seller, the original of which will be recorded by Buyer at Buyer's expense;

(iv). a duplicate original notice to the Division of Oil, Gas and Geothermal Resources as required by Section 3201 of the Public Resources Code of the State of California;

(v). a duplicate original Sublicense Agreement For Use of OEC Technology identical to Exhibit "D";

(vi). a duplicate original notice to OEC, pursuant to the Sublicense Agreement attached as Exhibit "D";

(vii). an executed Parent Company Confirmation substantially identical to Exhibit "F";

(viii). conveyance documents from Vintage to Seller duly executed and acknowledged in the same form as will be provided from Seller to Buyer together with written evidence of all Consents to such assignment, and

(ix). such other instruments or documents as Buyer may reasonably request of Seller to consummate the transaction contemplated herein.

14. Settlement: Not later than five (5) days prior to Closing, Seller shall deliver to Buyer a preliminary settlement statement that will reconcile the reasonably estimated expenses and revenues attributable to the period between the Effective Date and the Closing and other adjustments to the Purchase Price as prescribed in this Contract. The parties shall use their reasonable efforts to agree on such preliminary settlement statement no later than one (1) day prior to Closing. Not later than 90 days after Closing, or as soon thereafter as practicable, Seller shall deliver to Buyer a final settlement statement that will reconcile the actual expenses and revenues attributable to the period between the Effective Date and the Closing and other adjustments to the Purchase Price as prescribed in this Contract including, without limitation, any outstanding joint interest billings owed by either party or its affiliates to the other party or its affiliates, irrespective of whether it relates to the Property. The Parties shall use their best efforts to agree to such settlement statement within 30 days after delivery to Buyer. If unable to reach agreement, the parties agree to enter into alternative dispute resolution pursuant to Paragraph 24 of this Contract. Settlement will be made within 15 days following agreement on the settlement statement. Thereafter, additional proceeds received by or expenses paid by either Seller or Buyer for or on behalf of the other shall be settled by invoicing the other party for expenses paid or remitting to the other party any proceeds received within 10 days of receipt of such invoice.

15. Title Matters:

a. Asset Title Review: Seller shall make available until two (2) days before Closing at Seller's office at 110 West Seventh Street, Tulsa, Oklahoma, 74119, or such other place as deemed appropriate by Seller, upon execution of this Contract, during normal business hours, and Buyer shall examine such title information and abstracts as may then be available in Seller's and Vintage's files. Seller also agrees to provide copies to Buyer of all documents, reports, or similar information, if available, in Seller's and Vintage's files, which document and evidence Seller's ownership of the real property and working interest portions of the Assets being conveyed hereunder, as well as copies of any contracts, agreements or similar documents which benefit or obligate Seller as to the Assets or the production therefrom, i.e., production purchase contracts with third parties, including accounting records related thereto. Seller shall not perform any additional title work, and any existing abstracts and title opinions will not be made current by Seller. NO WARRANTY OF ANY KIND IS MADE BY SELLER AS TO THE COMPLETENESS OR ACCURACY OF INFORMATION SO SUPPLIED, and Buyer agrees that any conclusions drawn therefrom shall be the result of its own independent review and judgment; provided, however, that Seller represents that to the best of its knowledge, it has made available all of Seller's and Vintage's title information related to the Assets.

b. Title Adjustments: In the event of a "Title Defect" as defined in Paragraph 15.c below, Buyer shall notify Seller in writing of any matter Buyer considers to be a Title Defect not later than 9:00 a.m. CST on June 30, 2001 (the "Preliminary Defect Notice"); provided, however, that Buyer may notify Seller in writing of any Title Defect occurring subsequent to June 30, 2001 but prior to Closing ("Final Defect Notice"). Such notices shall include (i) a specific description of the matter Buyer asserts as a Title Defect, (ii) a specific description of the Asset or portion of the Assets that is affected by the Title Defect, (iii) Buyer's calculation of the amount by which each Title Defect has diminished the value of the Assets, such amount to be determined by Buyer in good faith and in a commercially reasonable manner, and (iv) reasonable supporting documentation. Buyer shall be deemed to have waived any Title Defect which Buyer fails to assert in its notices prior to the dates set forth in this Paragraph 15.b, or which Buyer accepts or assumes by Closing on that Asset.

c. Title Defect: The term "Title Defect" shall refer to any defect or deficiency in title to the Property, except for Permitted Encumbrances, that in Buyer's reasonable opinion (i) create a lien, claim, encumbrance, restriction or other obligation affecting the interests of Seller in the Assets, (ii) diminish Seller's net revenue interest described on Schedule 15.c., (iii) increase Seller's working interest described on Schedule 15.c. (defined as Seller's share of the

costs of operation, development or production borne by the owner of such interest without a corresponding increase in Seller's net revenue interest, or which creates an obligation to pay costs or expenses in an amount greater than such interest), or (iv) materially diminishes Seller's ability to exercise its ownership rights or operations of the Assets.

d. Permitted Encumbrances: As used in this Paragraph 15, the term "Permitted Encumbrance" means:

(i). lessor's royalties, non-participating royalties, overriding royalties and division orders and sales contracts containing customary terms and provisions covering oil, gas or associated liquefied or gaseous hydrocarbons, reversionary interests, and similar burdens if the net cumulative effect of such burdens does not operate to reduce the net revenue interest claimed by Seller;

(ii). subject to the provisions of Paragraph 25.2 hereof, preferential rights to purchase and required third party consents to assignments and similar agreements, exclusive of governmental consents or approvals, with respect to which prior to Closing (a ) waivers or consents are obtained from the appropriate parties or (b) the appropriate time period for asserting such rights has expired without an exercise of such rights;

(iii). liens for taxes or assessments not yet due or delinquent;

(iv). all rights to consent by, required notices to, filings with, or other actions by governmental entities in connection with the sale or conveyance of oil and gas leases or interests therein, if the same are customarily obtained subsequent to such sale or conveyance and Buyer has no reason to believe they cannot be obtained;

(v). conventional rights of reassignment requiring less than ninety (90) days notice to the holders of such rights;

(vi). such Title Defects as Buyer may have waived;

(vii). easements, road-use agreements, rights-of-way, servitudes, permits, surface leases and other rights in respect of surface operations; provided they do not materially interfere with Buyer's operation or use of the Assets;

(viii). defects, irregularities and deficiencies in title of or to any rights-of-way, road-use agreements, easements, surface leases or other rights which in the aggregate do not materially impair the use of such rights-of-way, road-use agreements, easements, surface leases or other rights

for the purpose of which such rights will be held by Buyer and would not have a material adverse effect on the operation or value of any of the Assets;

(ix). zoning, planning and environmental laws and regulations to the extent valid and applicable to the Assets;

(x). vendors', carriers', warehousemen's, repairmen's mechanics', workmen's, materialmen's, construction or other like liens arising by operation of law in the ordinary course of business or incident to the construction or improvement of any property in respect of obligations which are not yet due;

(xi). defects, irregularities and deficiencies in title of any of the Assets listed in Schedule 22.a.(x)(1); and

(xii). defects, irregularities and deficiencies in title of any of the Assets listed in the Notice of Defects letter dated November 24, 1999 sent by Buyer to Vintage Petroleum, Inc. ("Vintage") relating to the Asset Sale Agreement dated November 2, 1999 between Buyer and Vintage (the "Defect Notice").

e. Remedies for Title Failures: Seller shall have the right but not the obligation to cure any Title Defect asserted in such Preliminary Defect Notice or Final Defect Notice at its own expense prior to Closing. If Seller chooses to cure a Title Defect, Seller must cure the Title Defect to the reasonable satisfaction of Buyer before Closing. If Seller cures the Title Defect, the parties shall proceed to Closing without adjustment of the Purchase Price or termination of this Contract. Seller may delay Closing in order to attempt to cure any such Title Defect, but in no event shall closing be delayed beyond August 31, 2001; provided, however, Seller notifies Buyer in writing on or before Closing of Seller's delay. If Seller fails to cure any Title Defect on or prior to Closing, it shall be deemed to be a title failure ('Title Failure") for the relevant Asset. Buyer shall not be entitled to any adjustment to the Purchase Price until such time as the Title Failures aggregate to five percent (5%) of the Purchase Price (the "Deductible Amount"). Notwithstanding the provisions of the foregoing sentence or any other provision of this Contract, it is specifically agreed and understood that liquidated amounts due and owing in respect of vendors', carriers', warehousemen's, repairmen's, mechanics', workmen's, materialmen's, construction or other like liens shall not be included in the Deductible Amount, but shall otherwise be treated as Title Defects in accordance with the provisions of this Paragraph 15, including, without limitation, the provisions of this Paragraph 15.e (i)-(iii). It is fully understood by Seller and Buyer that Buyer shall never be entitled to an adjustment to the Purchase Price for the Deductible Amount. Buyer and Seller shall negotiate in

good faith to reach agreement regarding the value of any Title Failure based on the allocated lease values listed in Exhibit "G" attached hereto, and unless waived by Buyer shall mutually agree to one of the following options with respect to each Title Failure:.

(i). if the Title Failure results from a difference in net revenue interest from that claimed by Seller, the parties shall proceed to Closing and reduce the Purchase Price by an amount ("Defect Amount") determined by multiplying the Allocated Portion of the Purchase Price by a fraction, the numerator of which shall be the difference between the actual net revenue interest being conveyed and the net revenue interest claimed by Seller and the denominator of which shall be the net revenue interest claimed by Seller;

(ii). if the Title Failure affects all of Seller's interest in a defined portion of the Assets, such that the defect results in a complete failure of title to or total condemnation of such defined portion of the Assets, such affected Asset or defined portion of the Assets shall be deleted from the sale and the Purchase Price shall be reduced by the Defect Amount which shall be the portion of the Purchase Price that is allocated to the affected Asset or defined portion of the Asset; and

(iii). if the Title Failure is one other than described in items (i) or (ii), the Defect Amount shall be an amount determined in good faith by the mutual agreement of Buyer and Seller, taking into account the portion of the Purchase Price to be allocated by agreement of Seller and Buyer to the portion of the Assets affected by the Title Failure, the legal effect of the Title Failure, and the potential economic effect of the Title Failure over the life of the Assets.

f. Contract Termination: Notwithstanding anything to the contrary within this Paragraph 15, if the Parties cannot agree on the value of any Title Failure or if the aggregate amount of adjustments to the Purchase Price for Title Failures as set forth in the Preliminary and Final Defect Notice exceeds an amount equal to fifteen percent (15%) of the initial unadjusted Purchase Price, Seller or Buyer shall have the option to terminate this Contract, without any liability, upon written notice to the other on or prior to the Closing. For purposes of determining Seller's right to terminate this contract pursuant to this Paragraph 15.f the amount of Title Defect adjustments shall be the amounts set forth in Buyer's notices unless Buyer and Seller agree to a lesser amount in accordance with Paragraph 15.e. If either party exercises its option to terminate this Contract pursuant to this Paragraph 15.f, this Contract shall become void and have no effect and neither party shall have any further right or duty to or claim against the other party under this Contract, except as expressly provided to the contrary in this Contract.

g. Increase in Purchase Price: Seller shall be entitled to an increase in the Purchase Price with respect to any interest to which Seller has (i) record title ownership of a net revenue interest that is greater than the net revenue interest claimed by Seller and/or (ii) an ownership interest in any Personal Property greater than the interest for such Asset claimed by Seller. In the event that Seller is entitled to an adjustment, such adjustment shall be calculated in the same manner as downward adjustments to the Purchase Price in accordance with Paragraph 15.e. Buyer shall be obligated to notify Seller, if Buyer makes any determination of any interest increase at the same time as required for Title Defects Notice.15.e. Notwithstanding anything to the contrary herein, Buyer shall have the option to terminate this Contract due to an increase in the Purchase Price that Buyer deems is material, in its sole discretion. If Buyer exercises its option to terminate this Contract pursuant to this Paragraph 15.g., this Contract shall become void and have no effect, Seller shall return the principal amount of the Deposit to Buyer with interest and neither party shall have any further right or duty to or claim against the other party under this Contract, except as expressly provided to the contrary in this Contract.

16. Buyer's Acceptance of the Assets:

a. Subject to the terms of this Contract, at Closing Buyer assumes the risk of condition of the Assets, including compliance with all laws, rules, orders and regulations affecting the environment, whether existing before or after Closing and Buyer shall satisfy itself with respect thereto.

b. OTHER THAN AS STATED HEREIN, THE ASSETS ARE SOLD "AS IS, WHERE IS" AND SELLER MAKES NO WARRANTY, WHETHER EXPRESS OR IMPLIED IN FACT OR IN LAW, OF MERCHANTABILITY, FITNESS FOR ANY PURPOSE, STATE OF REPAIR, CONDITION OR SAFETY OF THE REAL OR PERSONAL PROPERTY, NOR COMPLIANCE WITH APPLICABLE LAW, RULE, ORDER AND REGULATION, CONCERNING THE ASSETS.

17. Physical Condition of the Assets:

a. The Assets have been used for oil and gas drilling and producing operations, related oilfield operations and possibly for the storage and disposal of waste materials or hazardous substances. Physical changes in the land may have occurred as a result of such uses. The Assets contain buried pipelines and other equipment, whether or not of a similar nature, the locations of which may not now be within the knowledge of Seller's or Vintage's current

employees, easily determined by an examination of Seller's records, or be readily apparent by a physical inspection of the property.

Except as set forth herein to the contrary, Buyer understands that neither Seller nor Vintage has the requisite information with which to determine the exact nature or condition of the Assets or the effect any such use has had on the physical condition of the Assets.

b. Buyer acknowledges that:

(i). It has entered into this Contract on the basis of its own investigation of the physical condition of the Assets, including subsurface condition.

(ii). The Assets have been used in the manner and for the purposes set forth above and that physical changes to the Assets may have occurred as a result of such use.

(iii). Low levels of naturally occurring radioactive material (NORM) may be present at some locations. NORM is a natural phenomena associated with many oil fields in the U.S. and throughout the world. Buyer should make its own determination on this matter.

(iv). Pursuant to the California Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65), Buyer is hereby notified and assumes the risk that detectable amounts of chemicals known to the State of California to cause cancer, birth defects and other reproductive harm may be found in, on or around the Assets.

(v). California Health and Safety Code Section 25359.7 provides that any owner of nonresidential real property who knows, or has reasonable cause to believe, that any release of hazardous substances as defined under California law, has come to be located on or beneath that real property shall, prior to the sale of that real property by that owner, give written notice of that condition to the Buyer of that real property. Buyer acknowledges that one or more hazardous substances as defined under California law, may have come to be located in or on the Assets.

(vi). Buyer acknowledges that some or all of the Assets may be situated in a seismic hazard zone as designated under Seismic Hazards Mapping Act (Public Resources Code Sections 2690-2699.6). Buyer and Seller agree that the Assets shall be deemed to be within a Seismic Hazard Zone for all purposes related to this Contract.

(vii). Buyer acknowledges that the Assets may be situated in an Earthquake Fault Zone under the Alquist-Priolo Earthquake Fault Zoning Act (Cal. PRC Sections 2621-2630) and the construction or development on the Assets of any structure for human occupancy may be subject to the findings of a geologic report prepared by a geologist registered in California, unless such report is waived by the city or county under the terms of that Act. Buyer and Seller agree that the Assets shall be deemed to be within an Earthquake Fault zone for all purposes related to this Contract.

(viii). **Subject to the provisions contained in Paragraphs 18 and 20, on Closing, Buyer shall assume the risk that the Assets may contain wastes or contaminants and that adverse physical conditions, including the presence of wastes or contaminants may not have been revealed by Buyer's or Seller's investigation, and all responsibility and liability related to disposal, spills, waste, or contamination on and below the Assets shall be transferred from Seller to Buyer. This provision shall survive the Closing.**

18. Buyer's Investigation and Indemnification:

a. Buyer shall conduct a thorough environmental and physical condition assessment of the Assets during the period ("Examination Period") beginning on the date of this Contract and ending four business days prior to Closing. Buyer and its agents shall have the right to do the following (and Seller agrees to cooperate reasonably with Buyer in this regard): to enter upon and within the Assets and all buildings and improvements thereon, inspect the same, conduct soil and water tests and borings, and generally conduct such tests, examinations, investigations and studies as may be necessary or appropriate in Buyer's sole judgment for the preparation of appropriate engineering and other reports and judgments relating to the Assets, their condition, and the presence of waste or contaminants. Additionally, Buyer shall have the right to thoroughly review all environmental, regulatory, engineering and other technical documents in Seller's or Vintage's possession relating directly to the Assets and those documents located in the Data Room. Buyer shall keep any data or information acquired by all such examinations and the results of all analyses of such data and information strictly confidential and not disclose same to any person or agency without the prior written approval of Seller; provided that, if Buyer or its agents obtain information that subjects it to any reporting requirement or duty to disclose under any environmental law, Buyer shall not be required to obtain Seller's approval prior to making the required report or disclosure, but Buyer shall notify Seller that it intends to make the required report or disclosure within a reasonable time so as to provide Seller an opportunity to object or legally prevent or protect such disclosure. Buyer shall

also supply to Seller, at no cost to Seller, a copy of any data or information compiled by Buyer.

b. Buyer is hereby granted access to the Assets prior to Closing to conduct its environmental assessment upon the following conditions:

(i). Buyer waives and releases all claims against Seller and Vintage, their respective directors, officers, employees and agents for injury to or death of persons or damage to property arising in any way from the exercise of rights granted to Buyer hereby or the activities of Buyer or its employees or agents on the Assets. Buyer shall indemnify Seller, Vintage, their respective directors, officers, employees and agents of Seller against and hold each and all of said indemnitees harmless from any and all loss, cost, damage, expense or liability, including attorneys' fees, whatsoever arising out of (a) any and all statutory or common law liens or other encumbrances for labor or materials furnished in connection with such tests, samplings, studies or surveys as Buyer may conduct with respect to the Assets, and (b) any injury to or death of persons or damage to property occurring in, on or about the Assets as a result of such exercise or activities (except where any such injury or damage is caused solely by the gross negligence or willful misconduct of any of said indemnitees). The foregoing obligation of indemnity shall survive Closing or termination of this Contract without Closing.

(ii). Buyer shall obtain and maintain comprehensive public liability and property damage insurance with respect to the exercise by Buyer and its agents of the rights granted in this Paragraph 18, which insurance shall: (a) be obtained from and maintained with an insurer acceptable to Seller, (b) have limits of not less than $1,000,000.00 per occurrence for death or injury and $500,000.00 for property damage, (c) cover Buyer's obligations under the indemnity provisions of this paragraph 18, (d) name Seller and Vintage as additional insureds, and (e) contain a provision pursuant to which the insurer agrees not to cancel or modify the insurance coverage without furnishing at least thirty (30) days' prior written notice to Seller. Prior to any exercise of the rights granted hereby, Buyer shall furnish to Seller a certificate evidencing the existence of the insurance required hereunder.

c. If as a result of information which Buyer obtains from any such assessment done by Buyer, it is determined by Buyer in its reasonable opinion that a material defect exists in regard to the Assets ("Material Defect") and/or that the environment associated with the Assets has been materially contaminated ("Materially Contaminated" or "Material Contamination"), such terms being defined as the violation of existing applicable federal or state laws or regulations or common law principles, with respect to environmental

conditions, to the extent that (i) prosecution, if instituted, would be reasonably likely to result in a penalty, fine or damage payment or (ii) removal and remediation of such contamination required by present federal or state laws or regulations or court order would be reasonably likely to result, and, other than the California and Hunter Cat leases, information of such Material Defect or Material Contamination was not contained in the data room during Buyer's 1999 visit, observable in the Buyer's 1999 site visits, or contained in the Defect Notice, Buyer shall notify Seller in writing of any and all such Material Defects or Material Contamination claims ("Preliminary Notice of Claims") no later than 9:00 a.m. CST, June 30, 2001; provided, however, that Buyer may notify Seller in writing any Material Defects or Material Contamination occurring subsequent to June 30, 2001 but prior to Closing ("Final Notice of Claims"). Buyer shall be deemed to have waived any Material Defect or Material Contamination which Buyer fails to assert on or before such dates. Notification shall include (i) a detailed description of such claim, (ii) a copy of any environmental assessment, reports, data and information pertaining to such claim, if applicable, and (iii) Buyer's calculation of the amount by which such claim has diminished the value of the Assets, such amount to be determined by Buyer in good faith and in a commercially reasonable manner. As used in this Paragraph 18, the term Damages shall mean any and all damage, loss, injury, or liabilities.

d. If Material Defects or Material Contamination exists the parties shall use their reasonable efforts to agree to an adjustment of the Purchase Price. If the parties cannot agree on the adjustment of the Purchase Price, either party shall be entitled to terminate this Contract without further liability to either party, unless Buyer agrees to waive such Material Defects and Material Contamination and assume all liability and obligations relating thereto. Each party shall cooperate with the other party's reasonable corrective work, and any operations unreasonably interfering with the corrective work shall cease until correction is completed. If Buyer or Seller exercises its option to terminate this Contract pursuant to this Paragraph 18.d, this Contract shall become null and void and have no effect and neither party shall have any further right or duty to or claim against the other party under this contract, except as expressly provided to the contrary in this Contract.

e. Subject to the provisions contained in Paragraphs 18 and 20, in the event of Closing, then Buyer shall acquire the Assets in an "AS IS, WHERE IS" condition and shall assume the risk that the Assets may contain waste materials or hazardous substances, and that adverse physical conditions, including but not limited to the presence of waste materials or hazardous substances or the presence of unknown abandoned and unabandoned oil and gas wells, water wells, sumps and pipelines or other Material Defects or Material Contamination may not have been revealed by Buyer's investigation,

**AND ALL RESPONSIBILITY AND LIABILITY RELATED TO ALL OF SUCH CONDITIONS WILL BE TRANSFERRED FROM SELLER TO BUYER.**

f. Except as otherwise stated in this Contract, as of Closing, Buyer specifically assumes and shall be responsible for all obligations and liabilities and shall defend, indemnify and hold Seller and Vintage harmless in accordance with Paragraph 21 (including, but not limited to, indemnification for liability under CERCLA, RCRA, environmental laws and regulations, as well as all acts, laws and regulations amendatory or supplemental thereto) against any and all damages pertaining to the environmental or physical condition of the Assets (whether relating to periods before or after the Effective Date).

g. In the event of Closing and with reasonable prior notice, Buyer shall grant to Seller a right of entry to the Assets to perform environmental remedial work at Seller's sole cost, risk and expense, if Seller, in its sole discretion, determines that such action is necessary to reduce alleged future environmental liabilities of Seller. Seller agrees to indemnify, hold harmless, and defend Buyer from and against all loss, liability, claims, fines, expenses, costs (including attorneys' fees and expenses), and causes of action caused by or arising out of Seller's use of the right of entry granted hereby and/or Seller's performance of environmental remedial work hereunder. Any such entry or action on the Assets by Seller shall not be construed as an admission of responsibility by Seller, nor shall Seller's action lessen or reduce Buyer's responsibility for environmental liability. A perpetual right of entry for environmental remedial work may be incorporated in the final documents transferring title to Buyer.

19. Compliance: Buyer shall comply with all applicable laws, rules, ordinances and regulations, and shall promptly obtain or request assignment from Seller or Vintage of all permits required by public authorities in connection with the Assets. Buyer shall comply with all covenants in the instruments in the chain of title to the Assets and with all terms and provisions, expressed or implied, in the agreements, deeds, and leases to which the Assets are subject. Seller and Vintage shall cooperate with Buyer before and after Closing in securing the issuance and assignment to Buyer of all permits relating to the ownership or operation of the Assets. Seller and Vintage shall cooperate with Buyer after the Closing in assigning all permits. In the event of Buyer's noncompliance resulting in Seller's or Vintage's receipt of a notice of breach that could result in cancellation of any oil and gas lease included in the Assets, Seller shall have the option, but not the obligation to cure such breach, within thirty (30) days from receipt of such notice; provided notice of Seller's intent to cure is given to Buyer in writing within fifteen (15) days of receipt. Buyer shall indemnify and hold harmless Seller for any action taken and upon further notice from Seller, Buyer shall have a period of thirty (30) days from receipt of further notice from Seller to reimburse Seller for any action taken.

20. Indemnification and Assumption of Obligations: Except as otherwise provided in Paragraph 21 below and elsewhere in this Contract, to the fullest extent permitted by law, but no further, Buyer shall assume full responsibility for the Assets as of Closing including, but not limited to, all operations, royalty payments, rental payments, suspense accounts and all accounting and reporting thereof and shall indemnify, hold harmless and defend Seller and Vintage from and against all loss, liability, claims, fines, expenses, costs (including attorney's fees and expenses) and causes of action, arising after the Closing, with respect thereto, including but not limited to, plugging and abandonment of existing wells, liability for previously plugged and abandoned wells, the restoration of the surface of the land as may be required under the applicable lease or as may be required by any federal, state or local agency having jurisdiction and the removal of or failure to remove any sumps, foundation, structures, or equipment. Except as otherwise provided in this Contract, for a period of 3 years after Closing, Seller and Vintage indemnify and hold Buyer harmless from and against all loss, liability, claims, fines, expenses, costs (including attorney's fees and expenses) and causes of action, arising prior to the Closing, with respect to operations, royalty payments, rental payments, suspense accounts and all accounting and reporting thereof; and any offsite disposal of hazardous waste, or Seller's gross negligence or willful misconduct related to the Property prior to Closing.

21. Indemnification and Assumption of Environmental Risks: Upon Closing and subject to Paragraph 20 above, to the fullest extent permitted by law, but no further, Buyer assumes full responsibility for, and agrees to indemnify, hold harmless and defend Seller and Vintage from and against all loss, liability, claims, fines, expenses, costs (including attorney's fees and expenses) and causes of action caused by or arising out of any current or hereinafter enacted federal, state or local laws, rules, orders, regulations and amendments thereto, applicable to any waste material or hazardous substances on or included with the Assets or the presence, disposal, release or threatened release of all waste material or hazardous substance from the Assets into the atmosphere or into or upon land or any water course or body of water, including ground water, or disposal of any waste material or hazardous substances on or included with the Assets, whether or not attributable to Seller's or Vintage's activities or ownership or the activities of Seller's or Vintages respective officers, employees or agents, or to the activities of third parties prior to, during or after the period of Seller's or Vintage's ownership of the Assets. This Indemnification and Assumption shall apply to liability for any environmental response actions undertaken pursuant to the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) or any other federal, state or local law.

22. Representations:

a. Seller's Representations. Seller represents and warrants that:

(i) Seller: (a) is a corporation duly organized, validly existing and in good standing under the laws of Oklahoma, (b) is duly qualified to transact business in California and in each jurisdiction where the

nature and extent of its business and properties require the same in order for it to perform its obligations under this Contract; and (c) possesses all requisite authority and power to conduct its business and execute, deliver and comply with the terms and provisions of this Contract and to perform all of its obligations hereunder.

(ii) This Contract and the Transaction have been duly authorized by Seller and do not conflict with any provisions of any by-law or other document under which Seller is organized.

(iii) This Contract has been duly executed and delivered by Seller and constitutes the valid and binding obligation of Seller, enforceable against it in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency or other laws relating to or affecting the enforcement of creditors' rights generally and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(iv) Seller represents that to the knowledge of Seller's or Vintage's senior management ("Seller's Knowledge") as of the date of this Contract and Closing, Seller's interests in the Assets shall be free and clear of any liens other than Permitted Encumbrances.

(v) To Seller's Knowledge, the Assets have been and are being operated in a prudent, workmanlike manner in accordance with industry standard and in compliance with all applicable laws, and the rules and regulations of any agency or authority having jurisdiction.

(vi) Buyer shall have no responsibility whatsoever, contingent or otherwise, for any brokers' or finders' fees incurred by Seller relating to the Transaction.

(vii) Not all files, records, information and materials related to the Property were provided to Buyer in the data room during Buyer's 1999 visit. Seller or Vintage will provide Buyer, prior to Closing all files, records, information and materials, in its possession, related to the Property.

(viii) There are no lawsuits, claims, actions, suits or investigations, pending or threatened that would materially impede the ownership or operation of the Property except as listed in Exhibit "H".

(ix) There are no consents to assign or preferential rights to purchase the Assets affecting any of the Assets except as listed in Exhibit "I".

(x) Call on Production. At the Closing Date, no party shall have any call upon, option to purchase or similar rights under any agreement with respect to the production of the Property from or attributable to the Assets.

(xi) Status and Operation of the Leases.

(1) Except as related to the Assets set forth in Schedule 22.a.(x)(1), to the best knowledge of Seller and Vintage, the leases associated with the Property ("Leases") are (i) in full force and effect

in accordance with their respective terms, (ii) Seller is in substantial compliance with their respective terms regarding the payment of royalties, (iii) Seller is not in default in the performance of any obligation on the part of Seller thereunder which could reasonably be expected to result in termination or cancellation thereof, and (iv) no third party claims or demands related to (i)-(iii) above have been made during the period between the Buyer's 1999 visit and Closing.

(2) To the best knowledge of Seller and Vintage, except for funds properly suspended for good cause in a separate account maintained by Seller, Seller has not received any proceeds from the sale of Hydrocarbons from the Interests which are subject to potential refund.

(3) Seller is being paid, without bond or indemnity of any kind except the usual warranties found in division orders and Hydrocarbon sales contracts customarily used in the petroleum industry, for its interest in the proceeds of the sale of Hydrocarbons from the Leases.

(4) With respect to all Leases operated by Seller and Vintage, and with respect to all Leases operated by unaffiliated third parties, to the best knowledge of Seller and Vintage, all costs incurred in connection with the operation of the Leases have been fully paid and discharged in accordance with the terms of payment therefor except (i) normal expenses incurred within the period between Buyer's 1999 visit and Closing and as to which Seller has not yet been billed, and (ii) costs that are being contested in good faith by Seller.

(5) Except as to the Assets listed on schedule 22.a.(x)(1), all material Applicable Contracts are in full force and effect, and neither Seller nor, to the best knowledge of Seller and Vintage, any other party is in default thereunder in any material respect.

(6) To the best knowledge of Seller and Vintage, no other party to any joint operating agreement or other Applicable Contract binding on the Interests is entitled to any adjustments of past accounts at the expense of Seller.

(7) Seller is not obligated by virtue of a claim arising from Seller, having prior to the Effective Date, taken gas in excess of the volume to which Seller was entitled or to deliver Hydrocarbons produced from the Interests at some future time.

(xii) Operation of the Assets Prior to Closing. Except as set forth in Paragraph 26 below, Seller is not aware of any legally binding agreements presently existing, except in the ordinary course of business, that may cause Seller prior to Closing, or Buyer after Closing, to acquire assets related to the Assets or otherwise improve the Assets.