## ENDORSEMENT NO. 15

This endorsement, effective 12:01 AM, June 26, 2002

Forms a part of Policy No:       8087804

Issued to:   GREKA ENERGY CORPORATION

By:  AMERICAN INTERNATIONAL SPECIALTY LINES INS. CO.

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### DISCLOSED DOCUMENTS ENDORSEMENT

It is hereby agreed that for purposes of Section II. EXCLUSIONS, 1. COMMON EXCLUSIONS - APPLICABLE TO ALL COVERAGES, Paragraph G. PRIOR KNOWLEDGE/NON-DISCLOSURE, the Company acknowledges receipt of the documents listed below.  **Pollution Conditions** identified in these documents are deemed disclosed to the Company.

| Author | Document | Date |
|---|---|---|
| Greka SMV, Inc. | Environmental Schedule | July 9, 2001 |
| Greka SMV, Inc. | E-mail titled "Well Abandonment Program" | August 2, 2001 |

All other terms, conditions, and exclusions shall remain the same.

COPY

_____
AUTHORIZED REPRESENTATIVE
or countersignature (in states where applicable)

76969 (11/00)                                                                 PAGE 1 OF 1
CI1178

## ENDORSEMENT NO. 16

This endorsement, effective 12:01 AM:   June 26, 2002

Forms a part of policy no.:       8087804

Issued to:   GREKA ENERGY CORPORATION

By:   AMERICAN INTERNATIONAL SPECIALTY LINES INS. CO.

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

#### DEFINITION OF CLEAN-UP ENDORSEMENT

It is hereby agreed  that for purposes of  Section  VIII. DEFINITIONS, Paragraph D., subparagraph 1., Clean-Up is defined as the following schedule of activities to be performed by a  ScheduledContractor pursuant to the execution of the  Remedial Plan with respect to CoverageK- KNOWN POLLUTANTS:

| Activities |
|---|
| 1. The Definition of Clean-Up, except for Zaca Field oil wells, will be limited to onsite remediation activities of crude oil impacted soils including transportation, soil excavation, and landfarming.  As respects Zaca Field wells,  Clean-up also includes plugging and abandonment of wells and restoration of the surface of the land as may be required under the applicable leases or as may be required by any federal, state, or local agency having jurisdiction. Clean-up costs for Zaca Field plug and abandonment are net of salvage value or reuse of tubing, rods, pipelines, pumping units, etc. and excludes internal costs such as soil clean-up costs.  Clean-up of wells does not include, but is not limited to; disposal of oilfield related equipment and materials, such as concrete, well casings, pipelines and associated equipment.<br><br>Clean-up levels are as they apply to typical oilfield clean-up for continued land use as oilfields.  Clean-up levels for total petroleum hydrocarbons are 1000 parts per million (ppm), and for kerosene distillate 100 ppm. For specific cleanup guidelines on BTEX, we will follow the industrial Preliminary Remediation Goals (PRGs) below, established by the US EPA.<br><br>Benzene:  1.4 ppm in soil<br>Toluene:  520 ppm in soil<br>Ethylbenzene:  230 ppm in soil<br>Xylenes:  210 ppm in soil |

All other terms, conditions and exclusions remain the same.



Authorized Representative
or countersignature (where required by law)

ENDORSEMENT NO. 17

**This endorsement, effective 12:01 AM, June 26, 2002**

**Forms a part of Policy No:**        8087804

**Issued to:**  GREKA ENERGY CORPORATION

**By:**  AMERICAN INTERNATIONAL SPECIALTY LINES INS. CO.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**<u>WAR EXCLUSION ENDORSEMENT</u>**

It is hereby agreed that the following exclusion is added to Section II. EXCLUSIONS, Subsection 1. COMMON EX-
CLUSIONS - APPLICABLE TO ALL COVERAGES:

**WAR**

Arising directly or indirectly as a result of or in connection with war, whether declared or not, or any act or condition
incident to war. War includes civil war, insurrection, act of foreign enemy, civil commotion, factional civil commotion,
military or usurped power, rebellion or revolution.

All other terms, conditions, and exclusions shall remain the same.

COPY

AUTHORIZED REPRESENTATIVE
or countersignature (in states where applicable)

ENDORSEMENT NO. 18

This endorsement, effective 12:01 AM, June 26, 2002

Forms a part of Policy No:      8087804

Issued to:  GREKA ENERGY CORPORATION

By:  AMERICAN INTERNATIONAL SPECIALTY LINES INS. CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### TERRORISM EXCLUSION ENDORSEMENT

It is hereby agreed that the following exclusion is added to Section II. EXCLUSIONS, Subsection 1. COMMON EX-CLUSIONS – APPLICABLE TO ALL COVERAGES:

#### TERRORISM

Arising directly or indirectly as a result of or in connection with **Terrorism**, including but not limited to, any contemporaneous or ensuing **Loss** caused by fire, looting or theft.

It is further agreed that the following definition is added to Section **VIII. DEFINITIONS**:

**Terrorism** means the use or threatened use of force or violence against person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm a government, the civilian population or any segment thereof, or to disrupt any segment of the economy.

**Terrorism** shall also include any act which is verified or recognized by the United States or Canadian Government as an act of terrorism.

All other terms, conditions, and exclusions shall remain the same.

COPY

_____
AUTHORIZED REPRESENTATIVE
or countersignature (in states where applicable)

# AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY

## POLLUTION LEGAL LIABILITY SELECT®CLEAN-UP COST CAP INSURANCE POLICY

MANY OF THE COVERAGES CONTAIN CLAIMS-MADE-AND-REPORTED REQUIREMENTS. PLEASE READ CAREFULLY. ADDITIONALLY, THIS POLICY HAS CERTAIN PROVISIONS AND REQUIREMENTS UNIQUE TO IT AND MAY BE DIFFERENT FROM OTHER POLICIES THE INSURED MAY HAVE PURCHASED. DEFINED TERMS, OTHER THAN HEADINGS, APPEAR IN BOLD FACE TYPE.

NOTICE: THE DESCRIPTIONS IN ANY HEADINGS OR SUB-HEADINGS OF THIS POLICY ARE INSERTED SOLELY FOR CONVENIENCE AND DO NOT CONSTITUTE ANY PART OF THE TERMS OR CONDITIONS HEREOF.

In consideration of the payment of the premium, in reliance upon the statements in the Declarations and the Application annexed hereto and made a part hereof, and pursuant to all of the terms of this Policy, the Company agrees with the **Named Insured** as follows:

I. INSURING AGREEMENTS

   1. COVERAGES:

   THE FOLLOWING COVERAGES ARE IN EFFECT ONLY IF SCHEDULED IN THE DECLARATIONS.

   COVERAGE A - ON-SITE CLEAN-UP OF PRE-EXISTING CONDITIONS

   1. To pay on behalf of the **Insured**, **Clean-Up Costs** resulting from **Pollution Conditions** on or under the **Insured Property** that commenced prior to the **Continuity Date**, if such **Pollution Conditions** are discovered by the **Insured** during the **Policy Period**, provided:

      (a) The discovery of such **Pollution Conditions** is reported to the Company in writing as soon as possible after discovery by the **Insured** and in any event during the **Policy Period** in accordance with Section III. of the Policy.

      Discovery of **Pollution Conditions** happens when a **Responsible Insured** becomes aware of **Pollution Conditions**.

      (b) Where required, such **Pollution Conditions** have been reported to the appropriate governmental agency in substantial compliance with applicable **Environmental Laws** in effect as of the date of discovery.

   2. To pay on behalf of the **Insured**, **Loss** that the **Insured** is legally obligated to pay as a result of **Claims** for **Clean-Up Costs** resulting from **Pollution Conditions** on or under the **Insured Property** that commenced prior to the **Continuity Date**, provided such **Claims** are first made against the **Insured** and reported to the Company in writing during the **Policy Period**, or during the Extended Reporting Period if applicable.

   COVERAGE B - ON-SITE CLEAN-UP OF NEW CONDITIONS

   1. To pay on behalf of the **Insured**, **Clean-Up Costs** resulting from **Pollution Conditions** on or under the **Insured Property** that commenced on or after the **Continuity Date**, if such **Pollution Conditions** are discovered by the **Insured** during the **Policy Period**, provided:

      (a) The discovery of such **Pollution Conditions** is reported to the Company in writing as soon as possible after discovery by the **Insured** and in any event during the **Policy Period** in accordance with Section III. of the Policy.

      Discovery of **Pollution Conditions** happens when a **Responsible Insured** becomes aware of **Pollution Conditions**.

      (b) Where required, such **Pollution Conditions** have been reported to the appropriate governmental agency in substantial compliance with applicable **Environmental Laws** in effect as of the date of discovery.

NOTICE: THIS INSURER IS NOT LICENSED IN THE STATE OF NEW YORK AND IS NOT SUBJECT TO ITS SUPERVISION

2. To pay on behalf of the **Insured**, **Loss** that the **Insured** is legally obligated to pay as a result of **Claims** for **Clean-Up Costs** resulting from **Pollution Conditions** on or under the **Insured Property** that commenced on or after the **Continuity Date**, provided such **Claims** are first made against the **Insured** and reported to the Company in writing during the **Policy Period**, or during the **Extended Reporting Period** if applicable.

## COVERAGE C - THIRD-PARTY CLAIMS FOR ON-SITE BODILY INJURY AND PROPERTY DAMAGE

To pay on behalf of the **Insured**, **Loss** that the **Insured** becomes legally obligated to pay as a result of **Claims** for **Bodily Injury** or **Property Damage** resulting from **Pollution Conditions** on or under the **Insured Property**, if such **Bodily Injury** or **Property Damage** takes place while the person injured or property damaged is on the **Insured Property**, provided such **Claims** are first made against the **Insured** and reported to the Company in writing during the **Policy Period**, or during the **Extended Reporting Period** if applicable.

## COVERAGE D - THIRD-PARTY CLAIMS FOR OFF-SITE CLEAN-UP RESULTING FROM PRE-EXISTING CONDITIONS

To pay on behalf of the **Insured**, **Loss** that the **Insured** becomes legally obligated to pay as a result of **Claims** for **Clean-Up Costs** resulting from **Pollution Conditions**, beyond the boundaries of the **Insured Property**, that commenced prior to the **Continuity Date**, and migrated from the **Insured Property**, provided such **Claims** are first made against the **Insured** and reported to the Company in writing during the **Policy Period**, or during the **Extended Reporting Period** if applicable.

## COVERAGE E - THIRD-PARTY CLAIMS FOR OFF-SITE CLEAN-UP RESULTING FROM NEW CONDITIONS

To pay on behalf of the **Insured**, **Loss** that the **Insured** becomes legally obligated to pay as a result of **Claims** for **Clean-Up Costs** resulting from **Pollution Conditions**, beyond the boundaries of the **Insured Property**, that commenced on or after the **Continuity Date**, and migrated from the **Insured Property**, provided such **Claims** are first made against the **Insured** and reported to the Company in writing during the **Policy Period**, or during the **Extended Reporting Period** if applicable.

## COVERAGE F - THIRD-PARTY CLAIMS FOR OFF-SITE BODILY INJURY AND PROPERTY DAMAGE

To pay on behalf of the **Insured**, **Loss** that the **Insured** becomes legally obligated to pay as a result of **Claims** for **Bodily Injury** or **Property Damage** resulting from **Pollution Conditions**, beyond the boundaries of the **Insured Property**, that migrated from the **Insured Property**, provided such **Claims** are first made against the **Insured** and reported to the Company in writing during the **Policy Period**, or during the **Extended Reporting Period** if applicable.

## COVERAGE G - THIRD-PARTY CLAIMS FOR ON-SITE BODILY INJURY, PROPERTY DAMAGE OR CLEAN-UP COSTS - NON-OWNED LOCATIONS

To pay on behalf of the **Insured**, **Loss** that the **Insured** becomes legally obligated to pay as a result of **Claims** for **Bodily Injury** or **Property Damage** of parties other than the owners, operators or contractors of the **Non-Owned Location**, or their employees, or **Clean-Up Costs** resulting from **Pollution Conditions** on or under the **Non-Owned Location**, provided such **Claims** are first made against the **Insured** and reported to the Company in writing during the **Policy Period**, or during the **Extended Reporting Period** if applicable.

## COVERAGE H - THIRD-PARTY CLAIMS FOR OFF-SITE BODILY INJURY, PROPERTY DAMAGE OR CLEAN-UP COSTS - NON-OWNED LOCATIONS

To pay on behalf of the **Insured**, **Loss** that the **Insured** becomes legally obligated to pay as a result of **Claims** for **Bodily Injury**, **Property Damage** or **Clean-Up Costs** resulting from **Pollution Conditions**, beyond the boundaries of the **Non-Owned Location**, that migrated from the **Non-Owned Location**, provided such **Claims** are first made against the **Insured** and reported to the Company in writing during the **Policy Period**, or during the **Extended Reporting Period** if applicable.

## COVERAGE I - POLLUTION CONDITIONS RESULTING FROM TRANSPORTED CARGO

To pay on behalf of the **Insured**, **Loss** that the **Insured** becomes legally obligated to pay as a result of

Copyright, American International Group, Inc. ®2000

Claims for **Bodily Injury**, **Property Damage** or **Clean-Up Costs** resulting from **Pollution Conditions** caused by **Transported Cargo**, provided such **Claims** are first made against the **Insured** and reported to the Company in writing during the **Policy Period**, or during the **Extended Reporting Period** if applicable. This coverage shall not be utilized to evidence financial responsibility of any **Insured** under any federal, state, provincial or local law.

**COVERAGE J - BUSINESS INTERRUPTION COVERAGE - ACTUAL LOSS OR RENTAL VALUE (ONLY AVAILABLE IF COVERAGE A, COVERAGE B OR BOTH COVERAGES A AND B ARE PURCHASED)**

To pay the **Insured's Actual Loss** or loss of **Rental Value**, and **Extra Expense** to the extent it reduces **Actual Loss** or loss of **Rental Value** otherwise payable under this coverage section, resulting from an **Interruption** caused directly by **Pollution Conditions** on or under the **Insured Property**. If the **Interruption** is caused by such **Pollution Conditions** and any other cause, the Company shall pay only for that portion of **Actual Loss** or loss of **Rental Value**, and **Extra Expense** resulting from an **Interruption** caused solely and directly by such **Pollution Conditions**.

1. Such **Pollution Conditions** must:

   (a) (i) Commence prior to the **Continuity Date**, if the **Named Insured** has purchased Coverage A, under this Policy, or

       (ii) Commence on or after the **Continuity Date**, if the **Named Insured** has purchased Coverage B under this Policy; and

   (b) Be first discovered by the **Insured** during the **Policy Period**. Discovery of **Pollution Conditions** happens when any **Responsible Insured** becomes aware of **Pollution Conditions**.

2. An **Interruption** must be reported to the Company, no later than thirty (30) days after its commencement. The **Insured** shall, as soon as practicable, resume normal operation of the business and dispense with **Extra Expense**.

3. In determining **Actual Loss** or loss of **Rental Value**, the Report/Worksheet annexed to this Policy and made a part of it shall be utilized. If the **Insured** could reduce the **Actual Loss** or loss of **Rental Value**, or **Extra Expense** resulting from an **Interruption**:

   (a) By complete or partial resumption of operations; or

   (b) By making use of other property at the **Insured Property**, or elsewhere,

   such reductions shall be taken into account in arriving at **Actual Loss** or loss of **Rental Value** or **Extra Expense**.

**COVERAGE K - KNOWN POLLUTANTS**

To pay on behalf of the **Insured**, **Clean-Up Costs** in excess of the **Self-Insured Retention** that the **Insured** incurs for the **Clean-Up** of **Pollutants** identified in the **Remedial Plan**. For this coverage to apply:

1. The **Named Insured** must timely and routinely report the **Clean-Up Costs** to the Company prior to the **Termination Date** in accordance with Section IV, Paragraph B.5; and

2. **Clean-Up** must occur on or after the **Inception Date** and before the **Termination Date**.

**COVERAGE L - UNKNOWN POLLUTANTS**

To pay on behalf of the **Insured**, **Clean-Up Costs** in excess of the **Self-Insured Retention** that the **Insured** incurs for the **Clean-Up** of **Pollutants** different from those identified in the **Remedial Plan**. For this coverage to apply:

1. The **Pollutants** must be first discovered pursuant to the execution of the **Remedial Plan**;

2. The **Pollutants** must originate from an **Insured Property**;

3. The **Insured** must report, in accordance with Section IV, Paragraph B.4, the discovery of **Pollutants**

76956 (11/00)
CI1165

different from those identified in the **Remedial Plan** to the Company as soon as practicable after discovery of such **Pollutants** and in any event included in the submission of the next scheduled **Clean-Up Cost Progress Report** and during the **Policy Period**;

4. The **Named Insured** must timely and routinely report the **Clean-Up Costs** to the Company prior to the **Termination Date** in accordance with Section IV. Paragraph B.5; and

5. **Clean-Up** must occur on or after the **Inception Date** and before the **Termination Date**.

## 2. LEGAL EXPENSE AND DEFENSE

The Company shall have the right and the duty to defend any **Claims** covered under Coverages A through I provided the **Named Insured** has purchased such Coverage. The Company's duty to defend or continue defending any such **Claim**, and to pay any **Loss**, shall cease once the applicable limit of liability, as described in Section V. (Limits of Coverage; Deductible) has been exhausted. Defense costs, charges and expenses are included in **Loss** and reduce the applicable limit of liability, as described in Section V. and are included within the Deductible amount for the Coverage Section that applies and is shown in Item 3 of the Declarations.

The Company will present any settlement offers to the **Insured**, and if the **Insured** refuses to consent to any settlement within the limits of liability of this Policy recommended by the Company and acceptable to the claimant, the Company's duty to defend the **Insured** shall then cease and the **Insured** shall thereafter negotiate or defend such **Claim** independently of the Company and the Company's liability shall not exceed the amount, less the Deductible or any outstanding Deductible balance, for which the **Claim** could have been settled if such recommendation was consented to.

## 3. INDEPENDENT COUNSEL

In the event the **Insured** is entitled by law to select independent counsel to defend the **Insured** at the Company's expense, the attorney fees and all other litigation expenses the Company must pay to that counsel are limited to the rates the Company would actually pay to counsel that the Company retains in the ordinary course of business in the defense of similar **Claims** in the community where the **Claim** arose or is being defended.

Additionally, the Company may exercise the right to require that such counsel have certain minimum qualifications with respect to their competency, including experience in defending **Claims** similar to the one pending against the **Insured**, and to require such counsel to have errors and omissions insurance coverage. As respects any such counsel, the **Insured** agrees that counsel will timely respond to the Company's request for information regarding the **Claim**. The **Insured** may at any time, by its signed consent, freely and fully waive its right to select independent counsel.

## II. EXCLUSIONS

### 1. COMMON EXCLUSIONS - APPLICABLE TO ALL COVERAGES

This Policy does not apply to **Clean-Up Costs**, **Claims Loss**, **Actual Loss**, **Extra Expense**, or loss of **Rental Value**:

#### A. CONTRACTUAL LIABILITY:

arising from liability of others assumed by the **Insured** under any contract or agreement, unless the liability of the **Insured** would have attached in the absence of such contract or agreement or the contract or agreement is an **Insured Contract**.

#### B. TRANSPORTATION:

except with respect to Coverage I, arising out of **Pollution Conditions** or **Pollutants** that result from the maintenance, use, operation, loading or unloading of any conveyance beyond the boundaries of the **Insured Property**.

Copyright, American International Group, Inc. ©2000

C.  INTENTIONAL NONCOMPLIANCE:

arising from **Pollution Conditions** or **Pollutants** based upon or attributable to any **Responsible Insured's** intentional, willful or deliberate noncompliance with any statute, regulation, ordinance, administrative complaint, notice of violation, notice letter, executive order, or instruction of any governmental agency or body. However, this exclusion does not apply to such noncompliance which resulted in the necessity for the **Remedial Plan**.

D.  INTERNAL EXPENSES:

for costs, charges or expenses incurred by the **Insured** for goods supplied or services performed by the staff or salaried employees of the **Insured**, or its parent, subsidiary or affiliate, except if in response to an emergency or pursuant to **Environmental Laws** that require immediate remediation of **Pollution Conditions** or **Pollutants**, or unless such costs, charges or expenses are incurred with the prior written approval of the Company in its sole discretion or are incurred by a **Scheduled Contractor**.

E.  INSURED vs. INSURED:

by any **Insured** against any other person or entity who is also an **Insured** under this Policy. This exclusion does not apply to **Claims** initiated by third parties or **Claims** that arise out of an indemnification given by one **Named Insured** to another **Named Insured** in an **Insured Contract**.

F.  EMPLOYER LIABILITY:

arising from **Bodily Injury** to an **Insured** or its parent, subsidiary or affiliate arising out of and in the course of employment by the **Insured** or its parent, subsidiary or affiliate. This exclusion applies whether the **Insured** may be liable as an employer or in any other capacity and to any obligation to share damages with or repay third parties who must pay damages because of the injury.

G.  PRIOR KNOWLEDGE/NON-DISCLOSURE:

arising from **Pollution Conditions** or **Pollutants** existing prior to the **Inception Date** and known by a **Responsible Insured** and not disclosed in the application for this Policy, or any previous policy for which this Policy is a renewal thereof.

2.  COVERAGE A THROUGH J EXCLUSIONS

A.  CRIMINAL FINES, PENALTIES, AND ASSESSMENTS:

due to any criminal fines, penalties or assessments.

B.  OTHER APPLICABLE COVERAGES:

arising from **Pollutants** identified in the **Remedial Plan** or first discovered pursuant to the execution of the **Remedial Plan** or otherwise covered under Coverage K or L.

C.  IDENTIFIED UNDERGROUND STORAGE TANK:

arising from **Pollution Conditions** resulting from an **Underground Storage Tank** whose existence is known by a **Responsible Insured** as of the **Inception Date** and which is located on the **Insured Property** unless such **Underground Storage Tank** is scheduled on the Policy by endorsement.

D.  ASBESTOS AND LEAD:

solely with respect to Coverages A, B, D, E, G, H, and J, arising from asbestos or any asbestos-containing materials or lead-based paint installed or applied in, on or to any building or other structure. This exclusion does not apply to **Clean-Up Costs** for the remediation of soil and groundwater.

3.  COVERAGE I EXCLUSIONS

The following exclusions apply to Coverage I.

This Policy does not apply to **Loss**:

Copyright, American International Group, Inc. ®2000

A.  **PROPERTY DAMAGE TO CONVEYANCES:**

for **Property Damage** to any conveyance utilized during the **Transportation of Transported Cargo**. This exclusion does not apply to **Claims** made by third-party carriers of the **Insured** for such **Property Damage** arising from the **Insured's** negligence.

B.  **POLLUTION CONDITIONS PRIOR OR SUBSEQUENT TO TRANSPORTATION OF CARGO:**

arising from **Pollution Conditions:**

1.  That commence prior to the **Transportation of Transported Cargo**; or

2.  That commence after **Transported Cargo** reaches its final destination, or while **Transported Cargo** is in storage off-loaded from the conveyance that was transporting it.

C.  **THIRD-PARTY CARRIER CLAIMS:**

made by a third-party carrier, its agents or employees, for **Bodily Injury, Property Damage** or **Clean-Up Costs**, whether or not the **Bodily Injury, Property Damage** or **Clean-Up Costs** were directly incurred by such third-party carrier. This exclusion does not apply to **Claims** arising from the **Insured's** negligence.

4.  **COVERAGE K AND L EXCLUSIONS**

The following exclusions apply to Coverages K and L.

This Policy does not apply to **Clean-Up Costs**

A.  **BODILY INJURY OR PROPERTY DAMAGE:**

arising from any **Bodily Injury** or **Property Damage**.

B.  **THIRD-PARTY LIABILITY:**

arising from any liability to any third-party for any reason whatsoever, other than for **Clean-Up Costs** otherwise covered under this Policy.

C.  **LABOR DISPUTES:**

arising from delay due to labor disputes, including, but not limited to, strikes.

D.  **LICENSE SUSPENSION:**

arising from suspension, lapse, modification or cancellation of any license, permit, lease or contract of a **Scheduled Contractor** performing work pursuant to the execution of the **Remedial Plan** which is required by the governmental entity or quasi-governmental entity responsible for supervision of the **Clean-Up**.

E.  **BANKRUPTCY:**

arising from default, bankruptcy or insolvency of any entity(s) involved in the **Clean-Up**, but this exclusion does not apply if the entity(s) involved in the **Clean-Up** has a performance bond issued by a surety company on the Federal Register of the United States Department of the Treasury which in fact provides coverage for the **Clean-Up** at the time of such default, bankruptcy or insolvency.

F.  **DENIAL OF ACCESS:**

arising from prohibition of access to any property by a third-party but this exclusion does not apply to any governmental entity or quasi-governmental entity responsible for supervision of the **Clean-Up** unless such prohibition is premised upon a suspension, lapse, modification or cancellation of any license, permit, lease or contract of a **Scheduled Contractor** as set forth in paragraph D. above.

G.  **UNREASONABLE DELAY:**

arising from unreasonable delay in a **Scheduled Contractor's** performance of **Clean-Up**, if such

delay is within the control of the **Scheduled Contractor** performing the **Clean-Up**.

### H. FAULTY WORKMANSHIP:

arising from faulty workmanship or defective materials.

### I. MODIFICATION OF THE REMEDIAL PLAN:

arising from any modification of the **Remedial Plan** unless:

1. Such modification is required by the governmental entity or quasi-governmental entity responsible for supervision of the **Clean-Up**; or

2. the Company has consented to such modification in advance, in writing.

### J. OTHER APPLICABLE COVERAGES:

any cost covered under any of Coverages A through I, as well as any cost in excess of the applicable policy limits of liability under Coverages A through I.

### K. FINES, PENALTIES AND MULTIPLIED DAMAGES:

any fines, penalties, punitive damages, exemplary damages, statutory assessments or the multiplied portion of any multiplied damages or any interest payments.

## III. NOTICE REQUIREMENTS AND CLAIM PROVISIONS

The **Insured** shall provide the Company with notice of **Pollution Conditions**, **Claims**, an **Interruption**, and the discovery of **Pollutants** as follows:

### A. NOTICE OF POLLUTION CONDITIONS, CLAIMS, AN INTERRUPTION AND POLLUTANTS

1. In the event of **Pollution Conditions** or **Claims** under Coverages A through I, an **Interruption** under Coverage J, or the increased quantity, concentration or disbursement of **Pollutants**, the discovery of **Pollutants** at or beyond the boundaries of an **Insured Property**, or the discovery of **Pollutants** different from those identified in the **Remedial Plan** under Coverages K or L, the **Insured** shall give written notice to:

   > Manager, Pollution Insurance Products Unit
   > AIG Technical Services, Inc.
   > Environmental Claims Department
   > 80 Pine Street, Sixth Floor
   > New York, New York 10005
   > Fax: (212) 344-2761

   or other address(s) as substituted by the Company in writing.

2. The **Insured** shall give written notice of **Pollution Conditions** or **Pollutants** as soon as possible. Notice under all coverages shall include, at a minimum, information sufficient to identify the **Named Insured**, the **Insured Property**, the names of persons with knowledge of the **Pollution Conditions** or **Pollutants** and all known and reasonably obtainable information regarding the time, place, cause, nature of and other circumstances of the **Pollution Conditions** or **Pollutants**.

3. The **Insured** shall give notice of **Claims** as soon as possible, but in any event during the **Policy Period** or during the **Extended Reporting Period**, if applicable. The **Insured** shall furnish information at the request of the Company. When a **Claim** has been made, the **Insured** shall forward the following to the Company as soon as possible:

   (a) All reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the claimant(s) and available witnesses.

   (b) All demands, summonses, notices or other process or papers filed with a court of law, administrative agency or an investigative body;

Copyright, American International Group, Inc. ®2000

(c) Other information in the possession of the **Insured** or its hired experts which the **Company** reasonably deems necessary.

B. **NOTICE OF POSSIBLE CLAIM - Coverages A through J**

1. If during the **Policy Period**, the **Insured** first becomes aware of a **Possible Claim**, the **Insured** may provide written notice to the **Company** during the **Policy Period** containing all the information required under Paragraph 2. below. Any **Possible Claim** which subsequently becomes a **Claim** made against the **Insured** and reported to the **Company** within five (5) years after the end of the **Policy Period** of this Policy or any continuous, uninterrupted renewal thereof, shall be deemed to have been first made and reported during the **Policy Period** of this Policy. Such **Claim** shall be subject to the terms, conditions and limits of coverage of the policy under which the **Possible Claim** was reported.

2. It is a condition precedent to the coverage afforded by this Section III. B that written notice under paragraph 1. above contain all of the following information: (a) the cause of the **Pollution Conditions**; (b) the **Insured Property** or other location where the **Pollution Conditions** took place; (c) the **Bodily Injury**, **Property Damage** or **Clean-Up Costs** which has resulted or may result from such **Pollution Conditions**; (d) the **Insured(s)** which may be subject to the **Claim** and any potential claimant(s); (e) all engineering information available on the **Pollution Conditions** and any other information that the **Company** deems reasonably necessary; and (f) the circumstances by which and the date the **Insured** first became aware of the **Possible Claim**.

IV. **RIGHTS OF THE COMPANY AND DUTIES OF THE INSURED IN THE EVENT OF POLLUTION CONDITIONS AND IN CONNECTION WITH REMEDIAL ACTIVITIES**

A. **Pollution Conditions - Coverages A Through J**

1. **The Company's Rights**

The **Company** shall have the right but not the duty to clean up or mitigate **Pollution Conditions** upon receiving notice as provided in Section III. of this Policy. Any sums expended in taking such action by the **Company** will be deemed incurred or expended by the **Insured** and shall be applied against the limits of coverage and deductible under this Policy.

2. **Duties of the Insured**

The **Named Insured** shall have the duty to clean up **Pollution Conditions** to the extent required by **Environmental Laws**, by retaining competent professional(s) or contractor(s) mutually acceptable to the **Company** and the **Named Insured**. The **Company** shall have the right but not the duty to review and approve all aspects of any such clean-up. The **Named Insured** shall notify the **Company** of actions and measures taken pursuant to this paragraph.

B. **Remedial Activities - Coverages K and L**

1. The **Company** shall have the right, but not the duty, to review, assess and inspect all aspects of any **Clean-Up** to which Coverages K or L apply, regardless of whether the **Insured** has incurred and paid **Clean-Up Costs** in excess of the **Self-Insured Retention**. Neither the **Company's** rights nor its exercise of the rights under this paragraph shall constitute an undertaking to determine or warrant that the **Clean-Up** is safe, healthful, or in conformity with applicable law.

2. The **Insured** shall take all reasonable and prudent steps to minimize **Clean-Up Costs**, limit access to the **Insured Property**, and prevent the spread of further contamination. If Coverage K applies, the **Insured** shall report as soon as practicable that the concentration, disbursement or quantity of any **Pollutant** exceeds the concentration, disbursement or quantity identified by the **Remedial Plan**.

3. The **Insured** shall retain a **Scheduled Contractor** to undertake and complete **Clean-Up**.

4. The **Insured** shall report increased quantity, concentration or disbursement of **Pollutants**, the discovery of **Pollutants** beyond the boundaries of the **Insured Property**, or the discovery of **Pollutants** different from those identified in the **Remedial Plan** in accordance with Section III. of the Policy.

5.  The **Named Insured** shall keep detailed records of all **Clean-Up Costs** and provide the Company with completed copies of the attached **Clean-Up Cost Progress Report** at the time intervals prescribed in Item 10 of the Declarations.

6.  To the extent of the **Insured's** legal right of access, the **Insured** shall permit the Company to inspect the **Insured Property**, any location identified in the **Remedial Plan**, and all financial records, drawings, plans and specifications concerning the **Clean-Up** or **Clean-Up Costs** as often as the Company chooses after providing reasonable notice.

7.  The **Insured** shall cooperate with the Company by providing the Company with:

    (a)  Access to all information developed or discovered by the **Insured** concerning the **Clean-Up**, whether or not deemed by the **Insured** to be relevant;

    (b)  Reasonable access to interview any agent, servant or employee of the **Insured** or any **Scheduled Contractor** or subcontractor involved in the **Clean-Up**; and

    (c)  Access to other information or other responses to reasonable requests from the Company concerning the **Clean-Up**.

## V.  LIMITS OF COVERAGE; DEDUCTIBLE

Regardless of the number of **Claims**, claimants, **Pollution Conditions**, **Pollutants**, **Insureds** or **Insured Properties** under this Policy, the following limits of liability apply:

### A.  Policy Aggregate Limit

The Company's total liability for all **Loss**, under Coverages A through I, all **Actual Loss** or loss of Rental Value, and **Extra Expense** under Coverage J, and all **Clean-Up Costs** under Coverages K and L, shall not exceed the "Policy Aggregate" stated in Item 4 of the Declarations.

### B.  Each Incident Limit - Coverages A Through I

1.  Subject to Paragraph V.A. above, the most the Company will pay for all **Loss** under each Coverage in Coverages A through I arising from the same, related or continuous **Pollution Conditions** is the "Each Incident" limit of coverage for that particular coverage stated in Item 3 of the Declarations.

2.  If the **Insured** first discovers **Pollution Conditions** during the **Policy Period** and reports them to the Company in accordance with Section III., all continuous or related **Pollution Conditions** reported to the Company under a subsequent Pollution Legal Liability Policy issued by the Company or its affiliate providing substantially the same coverage as this Policy shall be deemed to have been first discovered and reported during the **Policy Period**.

3.  If a **Claim** for **Bodily Injury**, **Property Damage**, or **Clean-Up Costs** is first made against the **Insured** and reported to the Company during the **Policy Period**, all **Claims** for **Bodily Injury**, **Property Damage** or **Clean-Up Costs**, arising from the same, continuous or related **Pollution Conditions** that are first made against the **Insured** and reported under a subsequent Pollution Legal Liability Policy issued by the Company or its affiliate providing substantially the same coverage as this Policy, shall be deemed to have been first made and reported during the **Policy Period**. Coverage under this Policy for such **Claims** shall not apply, however, unless at the time such **Claims** are first made and reported, the **Insured** has maintained with the Company or its affiliate Pollution Legal Liability coverage substantially the same as this coverage on a continuous, uninterrupted basis since the first such **Claim** was made against the **Insured** and reported to the Company.

### C.  Coverage Section Aggregate Limit

Subject to Paragraph V.A. above, the Company's total liability for all **Loss** under each Coverage in Coverages A through I, shall not exceed the "Coverage Section Aggregate" limit of coverage for that particular coverage stated in Item 3 of the Declarations.

Copyright, American International Group, Inc. ©2000

### D. Maximum for Clean-Up Cost Cap

1. Subject to Paragraph V.A. above, the Company's total liability for all **Clean-Up Costs** in excess of the **Self-Insured Retention** under Coverages K and L shall not exceed its percentage of the Limit of Liability stated in Item 3 of the Declarations, regardless of whether or not the **Insured** is financially unable, or is unwilling to pay its **Co-Insurance Participation** or its **Self-Insured Retention**. The **Self-Insured Retention** and **Co-Insurance Participation** are to be borne by the **Insured** and are not to be insured.

2. Subject to, and as part of the Company's total liability under Coverages K and L described in Paragraph V.D.1. above, the most the Company will pay for costs, charges or expenses expended for the preparation of a supplementary remedial plan and the associated investigation of **Pollutants** different from those identified in the **Remedial Plan**, if any, under Coverage L, shall not exceed 5% of the Limit of Liability stated in Item 3 of the Declarations.

### E. Maximum for All Business Interruption

Subject to Paragraph V.A. above, the maximum amount for which the Company is liable for all **Actual Loss** or loss of **Rental Value**, and **Extra Expense** under Coverage J is 80% of the lesser of:

1. the **Actual Loss** and **Extra Expense**, or loss of **Rental Value** and **Extra Expense**, whichever is applicable, incurred during the number of days of interruption of business stated in Item 3 of the Declarations, and

2. the amount stated in Item 3 of the Declarations.

It is a condition of Coverage J that the remaining 20% of such amount be borne by the **Insured** at its own risk and remain uninsured.

### F. Multiple Coverages

Subject to Paragraph V.A. above, if the same, related or continuous **Pollution Conditions** result in coverage under more than one Coverage under Coverages A through J, every applicable "Each Incident," "Coverage Section Aggregate," and "Maximum for All Business Interruption" limit of coverage among such coverage sections shall apply to the **Clean-Up Costs, Loss, Actual Loss** and **Extra Expense**, or loss of **Rental Value** and **Extra Expense**, whichever is applicable, resulting from such **Pollution Conditions**.

### G. Deductible/Self-Insured Retention

1. Coverages A through I

Subject to Paragraphs V.A. through V.F. above, this Policy is to pay covered **Loss** in excess of the Deductible amount stated in Item 3 of the Declarations for the applicable coverage, up to but not exceeding the applicable "Each Incident" limit of coverage.

If the same, related or continuous **Pollution Conditions** result in coverage under more than one coverage section in Coverages A through I, only the highest Deductible amount stated in Item 3 of the Declarations among all the coverage sections applicable to the **Loss** will apply.

The **Insured** shall promptly reimburse the Company for advancing any element of **Loss** falling within the Deductible.

2. Coverage J

Subject to Paragraphs V.A. through V.F. above, this Policy is to pay the **Actual Loss** or loss of **Rental Value**, and **Extra Expense** under Coverage J in excess of the **Actual Loss** or loss of **Rental Value**, and **Extra Expense** sustained during the first seven (7) days of an **Interruption** during the **Period of Restoration**. The seven (7) day period applies to all **Actual Loss**, or loss of **Rental Value** and **Extra Expense** arising from the same, related or continuous **Pollution Conditions**.

Copyright, American International Group, Inc. ®2000
Page 10

3.  Coverages K and L

Subject to Paragraphs V.A. through V.F. above, this Policy is to pay **Clean-Up Costs** under Coverages K and L in excess of the **Self-Insured Retention** and **Co-Insurance Participation**.

## VI. CONDITIONS

A.  **Assignment** - This Policy may be assigned with the prior written consent of the Company, which consent shall not be unreasonably withheld or delayed. Assignment of interest under this Policy shall not bind the Company until its consent is endorsed thereon.

B.  **Subrogation** - In the event of any payment under this Policy, the Company shall be subrogated to all the **Insured's** rights of recovery therefor against any person or organization and the **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights including without limitation, assignment of the **Insured's** rights against any person or organization who caused **Pollution Conditions** or is responsible for any **Pollutants** on account of which the Company made any payment under this Policy. The **Insured** shall do nothing to prejudice the Company's rights under this paragraph subsequent to **Loss**. Any recovery as a result of subrogation proceedings arising out of the payment of **Loss** or **Clean-Up Costs** covered under this Policy shall accrue first to the **Insured** to the extent of any payments in excess of the limit of coverage; then to the Company to the extent of its payment under the Policy and to the **Insured** to the extent of its **Co-Insurance Participation**; and then to the **Insured** to the extent of its Deductible or **Self-Insured Retention**. Expenses incurred in such subrogation proceedings shall be apportioned among the interested parties in the recovery in the proportion that each interested party's share in the recovery bears to the total recovery.

C.  **Cooperation** - The **Insured** shall cooperate with the Company and offer all reasonable assistance in the investigation and defense of **Claims** or the evaluation of **Clean-Up Costs** under the applicable Coverages purchased. The Company may require that the **Insured** submit to examination under oath, and attend hearings, depositions and trials. In the course of investigation or defense, the Company may require written statements or the **Insured's** attendance at meetings with the Company. The **Insured** must assist the Company in effecting settlement, securing and providing evidence and obtaining the attendance of witnesses.

D.  **Changes** - Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Policy or stop the Company from asserting any rights under the terms of this Policy; nor shall the terms of this Policy be waived or changed, except by endorsement issued by the Company to form a part of this Policy.

E.  **Voluntary Payments** - No **Insured** shall voluntarily enter into any settlement, or make any payment or assume any obligation unless in response to an emergency or pursuant to **Environmental Laws** that require immediate remediation of **Pollution Conditions** or **Pollutants**, without the Company's consent which shall not be unreasonably withheld, except at the **Insured's** own cost.

F.  **Concealment or Fraud** - This entire Policy shall be void as of its inception if, whether before or after **Clean-Up Costs** are incurred or a **Claim** is first made, the **Named Insured** has willfully concealed or misrepresented any fact or circumstance material to the granting of coverage under this Policy, the description of the **Insured Property**, or the interest of the **Insured** therein.

G.  **Cancellation** - This Policy may be cancelled by the **Named Insured** by surrender thereof to the Company or any of its authorized agents or by mailing to the Company written notice stating when thereafter the cancellation shall be effective. This Policy may be cancelled by the Company only for the reasons stated below by mailing to the **Named Insured** at the address shown in the Policy, written notice stating when not less than 60 days (10 days for nonpayment of premium) thereafter such cancellation shall be effective. Proof of mailing of such notice shall be sufficient proof of notice.

1.  Material misrepresentation by the **Insured**;

2.  The **Insured's** failure to comply with the material terms, conditions or contractual obligations under this Policy, including failure to pay any premium or Deductible when due;

Copyright, American International Group, Inc. ®2000

3. A change in operations at an **Insured Property** during the **Policy Period** that materially increases a risk covered under this Policy.

The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice either by the **Named Insured** or by the Company shall be equivalent to mailing.

H. **Other Insurance** - Where other insurance or surety bonds may be available for **Loss, Actual Loss** or loss of **Rental Value,** and **Extra Expense** or **Clean-Up Costs** covered under this Policy, the **Insured** shall promptly upon request of the Company provide the Company with copies of all such policies. If other valid and collectible insurance is available to the **Insured** for **Loss, Actual Loss** or loss of **Rental Value,** and **Extra Expense** or **Clean-Up Costs** covered by this Policy, the Company's obligations are limited as follows:

1. This insurance is primary, and the Company's obligations are not affected unless any of the other insurance is also primary. In that case, the Company will share with all such other insurance by the method described in Paragraph 3. below.

2. Solely with respect to Coverages K and L, this insurance is excess over any other insurance and surety bonds which may be primary, and the Company's obligations are not affected unless any of the other insurance is also excess. In that case, the Company will share with all such other insurance by the method described in paragraph 3. below.

3. If all of the other insurance permits contribution by equal shares, the Company will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. If any of the other insurance does not permit contribution by equal shares, the Company will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

I. **Right of Access and Inspection** - To the extent the **Insured** has such rights, any of the Company's authorized representatives shall have the right and opportunity but not the obligation to interview persons employed by the **Insured** and to inspect at any reasonable time, during the **Policy Period** or thereafter, the **Insured Property.** Neither the Company nor its representatives shall assume any responsibility or duty to the **Insured** or to any other party, person or entity, by reason of such right or inspection. Neither the Company 's right to make inspections, sample and monitor, nor the actual undertaking thereof nor any report thereon shall constitute an undertaking on behalf of the **Insured** or others, to determine or warrant that property or operations are safe, healthful or conform to acceptable engineering practices or are in compliance with any law, rule or regulation. The **Named Insured** agrees to provide appropriate personnel to assist the Company's representatives during any inspection.

J. **Access to Information** - The **Named Insured** agrees to provide the Company with access to any information developed or discovered by the **Insured** concerning **Loss** or **Clean-Up Costs** covered under this Policy, whether or not deemed by the **Insured** to be relevant to such **Loss** or **Clean-Up Costs** and to provide the Company access to interview any **Insured** and review any documents of the **Insured.**

K. **Representations** - By acceptance of this Policy, the **Named Insured** agrees that the statements in the Declarations, the Application and the Report/Worksheet are their agreements and representations, that this Policy is issued in reliance upon the truth of such representations and that this Policy embodies all agreements existing between the **Insured** and the Company or any of its agents relating to this insurance.

L. **Action Against Company** - No third-party action shall lie against the Company, unless as a condition precedent thereto there shall have been full compliance with all of the terms of this Policy, nor until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured,** the claimant and the Company.

Any person or organization or the legal representative thereof who has secured such judgment or written

Copyright, American International Group, Inc. ®2000

agreement shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by the Policy. No person or organization shall have any right under this Policy to join the Company as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the Company be impleaded by the **Insured** or his legal representative. Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate shall not relieve the Company of any of its obligations hereunder.

M. **Arbitration** - It is hereby understood and agreed that all disputes or differences that may arise under or in connection with this Policy, whether arising before or after termination of this Policy, including any determination of the amount of **Loss** or **Clean-Up Costs**, may be submitted to the American Arbitration Association under and in accordance with its then prevailing commercial arbitration rules. The arbitrators shall be chosen in the manner and within the time frames provided by such rules. If permitted under such rules, the arbitrators shall be three disinterested individuals having knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute.

Any party may commence such arbitration proceeding and the arbitration shall be conducted in the **Insured's** state of domicile. The arbitrators shall give due consideration to the general principles of the law of the **Insured's** state of domicile in the construction and interpretation of the provisions of this Policy; provided, however, that the terms, conditions, provisions and exclusions of this Policy are to be construed in an evenhanded fashion as between the parties. Where the language of this Policy is alleged to be ambiguous or otherwise unclear, the issue shall be resolved in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the Policy (without regard to the authorship of the language, the doctrine of reasonable expectation of the parties and without any presumption or arbitrary interpretation or construction in favor of either party or parties, and in accordance with the intent of the parties.)

The written decision of the arbitrators shall set forth its reasoning, shall be provided simultaneously to both parties and shall be binding on them. The arbitrators' award shall not include attorney fees or other costs. Judgment on the award may be entered in any court of competent jurisdiction. Each party shall bear equally the expenses of the arbitration.

N. **Service Of Suit** - It is agreed that in the event of failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the **Insured**, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon General Counsel, Legal Department, American International Specialty Lines Insurance Company, 70 Pine Street, New York, NY 10270, or his or her representative, and that in any suit instituted against the Company upon this contract, the Company will abide by the final decision of such court or of any appellate court in the event of any appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner, Director of Insurance, or other officer specified for that purpose in the statute, or his or her successor or successors in office as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above named General Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

O. **Acknowledgment of Shared Limits** - By acceptance of this Policy, the **Named Insureds** understand, agree and acknowledge that the Policy contains a Policy Aggregate Limit that is applicable to, and will be shared by, all **Named Insureds** and all other **Insureds** who are or may become insured hereunder. In view of the operation and nature of this shared Policy Aggregate Limit, the **Named Insureds** and all other **Insureds** understand and agree that prior to filing a **Claim** under the Policy, the Policy Aggregate Limit may be exhausted or reduced by prior payments for other **Claims** under the Policy.

P.  **Separation of Insureds** - It is hereby agreed that except with respect to the Limit of Liability, Section II. 1. E. (Insured vs. Insured exclusion), and any rights and duties specifically assigned to the first **Named Insured**, this insurance applies: 1. As if each **Named Insured** were the only **Named Insured**; and 2. Separately to each **Named Insured** against who a **Claim** is made. Misrepresentation, concealment, breach of a term or condition, or violation of any duty under this Policy by one **Named Insured** shall not prejudice the interest of coverage for another **Named Insured** under this Policy. Provided, however, that this Condition shall not apply to any **Named Insured** who is a parent, subsidiary or affiliate of the first **Named Insured**.

Q.  **Earning of Premium** - The premium stated in Item 6 of the Declarations is 100% earned at the **Inception Date** of this Policy. Any cancellation of the Policy by the **Insured** shall not result in a return of any premium.

R.  **Sale or Transfer of the Insured Property** (Coverages K and L only) - In the event that control of the **Remedial Plan** is relinquished by the **Named Insured** or an **Insured Property** is sold or ownership or operational control is transferred by the **Named Insured** prior to the completion of the **Clean-Up** to which this Policy applies, this Policy shall remain in full force and effect, subject to its terms and conditions only if:

1.  The Company receives written notification at least forty-five (45) days prior to the effective date of such sale or transfer and consents to the sale or transfer, which consent shall not be unreasonably withheld; and

2.  The new owner or operator of the **Insured Property** fully complies with all applicable conditions, duties and obligations set forth in this Policy.

## VII. EXTENDED REPORTING PERIOD FOR CLAIMS - COVERAGES A THROUGH I

The **Named Insured** shall be entitled to an Automatic **Extended Reporting Period**, and (with certain exceptions as described in Paragraph B. of this Section) be entitled to purchase an Optional **Extended Reporting Period** for Coverages A through I collectively, upon termination of coverage as defined in Paragraph B.3. of this Section. Neither the Automatic nor the Optional **Extended Reporting Period** shall reinstate or increase any of the limits of liability of this Policy.

A.  Automatic Extended Reporting Period

Provided that the **Named Insured** has not purchased any other insurance to replace this insurance and which applies to a **Claim** otherwise covered hereunder, the **Named Insured** shall have the right to the following: a period of sixty (60) days following the effective date of such termination of coverage in which to provide written notice to the Company of **Claims** first made and reported within the Automatic **Extended Reporting Period**.

A **Claim** first made and reported within the Automatic **Extended Reporting Period** will be deemed to have been made on the last day of the **Policy Period**, provided that the **Claim** arises from **Pollution Conditions** that commenced before the end of the **Policy Period** and is otherwise covered by this Policy. No part of the Automatic **Extended Reporting Period** shall apply if the **Optional Extended Reporting Period** is purchased.

B.  Optional Extended Reporting Period

The **Named Insured** shall be entitled to purchase an Optional **Extended Reporting Period** upon termination of coverage as defined herein (except in the event of nonpayment of premium), as follows:

1.  A **Claim** first made and reported within the Optional **Extended Reporting Period**, if purchased in accordance with the provisions contained in Paragraph 2. below, will be deemed to have been made on the last day of the **Policy Period**, provided that the **Claim** arises from **Pollution Conditions** that commenced before the end of the **Policy Period** and is otherwise covered by this Policy.

2.  The Company shall issue an endorsement providing an Optional **Extended Reporting Period** of up

Copyright, American International Group, Inc. ®2000

to forty (40) months from termination of coverage hereunder for all **Insured Properties** and **Non-Owned Locations**, if applicable, or any specific **Insured Property** or **Non-Owned Location**, provided that the **Named Insured**:

(a) Makes a written request for such endorsement which the Company receives within thirty (30) days after termination of coverage as defined herein; and

(b) Pays the additional premium when due. If that additional premium is paid when due, the **Extended Reporting Period** may not be cancelled, provided that all other terms and conditions of the Policy are met.

3. Termination of coverage occurs at the time of cancellation or nonrenewal of this Policy by the **Named Insured** or by the Company, or at the time of the Company's deletion of a location which previously was an **Insured Property** or **Non-Owned Location**.

4. The Optional Extended Reporting Period is available to the **Named Insured** for not more than 200% of the full Policy premium stated in the Declarations.

## VIII. DEFINITIONS

A. **Actual Loss** means the:

1. Net income (net profit or loss before income taxes) the **Insured** would have earned or incurred had there been no **Interruption**; and

2. Continuing normal operating expenses incurred, including **Ordinary Payroll Expense.**

B. **Bodily Injury** means physical injury, or sickness, disease, mental anguish or emotional distress, sustained by any person, including death resulting therefrom.

C. **Claim** means a written demand received by the **Insured** seeking a remedy or alleging liability or responsibility on the part of the **Insured** for **Loss** under Coverages A through I. For purposes of this Policy, a **Claim** does not include a **Possible Claim** that was reported under a prior policy but which has become a **Claim** during the **Policy Period** of this Policy as described in Section III. B.

D. **Clean-Up** means:

1. With respect to Coverage K, those activities, identified in the Definition of Clean-Up Endorsement, that are performed by a **Scheduled Contractor** in the execution of the **Remedial Plan**;

2. With respect to Coverage L, preparation of a supplementary remedial plan including the associated investigation of **Pollutants** different from those identified in the **Remedial Plan**, subject to the sub-limit set forth in Section V. Paragraph D.2., and the removal, disposal, treatment (including in situ treatment) or neutralization of **Pollutants** different from those identified in the **Remedial Plan** to the standard governing the future use of the **Insured Property** and anticipated in the **Remedial Plan**, but **Clean-Up** does not include any monitoring activities required after the completion of such removal, disposal, treatment or neutralization.

E. **Clean-Up Costs** means:

1. With respect to Coverages A through I, reasonable and necessary expenses, including legal expenses incurred with the Company's written consent which consent shall not be unreasonably withheld or delayed, for the investigation, removal, remediation including associated monitoring, or disposal of soil, surfacewater, groundwater or other contamination:

(a) To the extent required by **Environmental Laws**; or

(b) That have been actually incurred by the government or any political subdivision of the United States of America or any state thereof or Canada or any province thereof, or by third parties.

2. With respect to Coverage K, reasonable and necessary costs, charges, and expenses incurred solely for **Clean-Up**, as identified in the Definition of Clean-Up Endorsement;

Copyright, American International Group, Inc. ® 2000

3. With respect to Coverage L, reasonable and necessary costs, charges, and expenses incurred solely for **Clean-Up**.

4. Solely with respect to Coverages K and L, **Clean-Up Costs** does not include:

   (a) Costs, charges or expenses incurred for litigation, arbitration or other form of dispute resolution in any way related to or in connection with **Clean-Up**, including fees of attorneys, consultants, investigators, adjusters and experts, unless otherwise expressly consented to in writing and in advance by the Company and specifically included in the Definition of Clean-Up Endorsement; or

   (b) Costs, charges or expenses expended in preparation of the **Remedial Plan**; provided, however, the sub-limit of liability described in Section V., Paragraph D.2, shall apply to reasonable and necessary costs, charges or expenses expended in preparation of a supplementary remedial plan and the associated investigation of **Pollutants** different from those identified in the **Remedial Plan** under Coverage L.

   **Clean-Up Costs** also include **Restoration Costs.**

F. **Clean-Up Cost Progress Reports** means reports completed by the **Insured** which summarize Clean-Up activities performed and anticipated to be performed and the costs and estimated costs of those activities The form of the reports will be established by the Company and attached to this policy. The reports must be completed by the **Insured** and submitted to the Company at the time intervals prescribed in Item 10 of the Declarations.

G. **Co-Insurance Participation** means the percentage of **Clean-Up Costs** the **Insured** must bear in excess of the **Self-Insured Retention**, as shown in Item 3 of the Declarations.

H. **Continuity Date** means the date stated in Item 8 of the Declarations.

I. **Environmental Laws** means any federal, state, provincial or local laws (including, but not limited to, statutes, rules, regulations, ordinances, guidance documents, and governmental, judicial or administrative orders and directives) that are applicable to **Pollution Conditions.**

J. **Extended Reporting Period** means either the automatic additional period of time or the optional additional period of time, whichever is applicable, in which to report **Claims** following termination of coverage, as described in Section VII. of this Policy.

K. **Extra Expense** means necessary expenses the **Insured** incurs during the **Period of Restoration:**

   1. That would not have been incurred if there had not been an **Interruption**; and

   2. That avoid or minimize an **Interruption,**

   but only to the extent such expenses reduce **Actual Loss** or loss of **Rental Value**, whichever is applicable, otherwise covered under this Policy.

   Extra Expense will be reduced by any salvage value of property obtained for temporary use during the **Period of Restoration** that remains after the resumption of normal operations.

L. **Inception Date** means the first date set forth in Item 2 of the Declarations.

M. **Insured** means the Named **Insured**, and any past or present director, officer, partner or employee thereof, including a temporary or leased employee, while acting within the scope of his or her duties as such.

N. **Insured Contract** means a contract or agreement submitted to and approved by the Company, and listed on an Endorsement to this Policy.

O. **Insured Property** means with respect to Coverages A through J, each of the locations identified in Item 5(a) of the Declarations, and with respect to Coverages K and L, each of the locations identified in Item 5(b) of the Declarations.

Copyright, American International Group, Inc. ®2000

P. **Interruption** means the necessary suspension of the **Insured's** business operations at an **Insured Property** during the **Period of Restoration** .

Q. **Loss** means, under the applicable Coverages: 1. monetary awards or settlements of compensatory damages; where allowable by law, punitive, exemplary, or multiple damages; and civil fines, penalties, or assessments for **Bodily Injury** or **Property Damage**; 2. costs, charges and expenses incurred in the defense, investigation or adjustment of **Claims** for such compensatory damages or punitive, exemplary or multiple damages, and civil fines, penalties or assessments, or for **Clean-Up Costs**; or 3. C lean-Up Costs.

R. **Named Insured** means the person or entity named in Item 1 of the Declarations acting on behalf of all other **Insureds**, if any, for the payment or return of any premium, payment of any deductible, receipt and acceptance of any endorsement issued to form a part of this Policy, giving and receiving notice of cancellation or nonrenewal, and the exercise of the rights provided in the **Extended Reporting Period** clause.

S. **Natural Resource Damage** means physical injury to or destruction of, including the resulting loss of value of, land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the fishery conservation zone established by the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.)), any state or local government, any foreign government, any Indian tribe, or, if such resources are subject to a trust restriction on alienation, any member of an Indian tribe.

T. **Non-Owned Location** means a site that is not owned or operated by the **Named Insured**, and that is identified in a Non-Owned Locations Schedule attached to and made a part of this Policy by endorsement.

U. **Ordinary Payroll Expense** means the entire payroll expense for all employees of the **Insured**, except officers, executives, department managers and employees under contract.

V. **Period of Restoration** means the length of time as would be required with the exercise of due diligence and dispatch to restore the **Insured Property** to a condition that allows the resumption of normal business operations, commencing with the date operations are interrupted by **Pollution Conditions** and not limited by the date of expiration of the **Policy Period**. The **Period of Restoration** does not include any time caused by the interference by employees or other persons with restoring the property, or with the resumption or continuation of operations.

W. **Policy Period** means the period set forth in Item 2 of the Declarations, or any shorter period arising as a result of:

   1. Cancellation of this Policy; or

   2. With respect to particular **Insured Property(s)** or **Non-Owned Location(s)** designated in the Declarations, the deletion of such location(s) from this Policy by the Company at the **Named Insured's** written request, but solely with respect to that **Insured Property** or **Non-Owned Location**.

X. **Pollutants** means wastes and any solid, liquid, gaseous or thermal irritant or contaminant, including, soot, acids, alkalis, or toxic chemicals that were present on, under or migrated from the **Insured Property** prior to the **Inception Date**.

Y. **Pollution Conditions** means the discharge, dispersal, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including, but not limited to, smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, medical waste and waste materials into or upon land, or any structure on land, the atmosphere or any watercourse or body of water, including groundwater, provided such conditions are not naturally present in the environment in the amounts or concentrations discovered.

Z. **Possible Claim** means **Pollution Conditions** that commenced on or after the **Inception Date** that the **Insured** reasonably expects may result in a **Claim**.

AA.  **Property Damage** *means:*

    1.  Except with respect to Coverage C, physical injury to or destruction of tangible property of parties other than the **Insured**, including the resulting loss of use and diminution in value thereof;

    2.  Loss of use, but not diminution in value, of tangible property of parties other than the **Insured** that has not been physically injured or destroyed;

    3.  Solely with respect to Coverage C, physical injury to or destruction of tangible property of parties other than the **Insured**, including the resulting loss of use thereof; and

    4.  **Natural Resource Damage.**

    **Property Damage** does not include **Clean-Up Costs.**

BB.  **Remedial Plan** means the documentation identified in the Definition of Remedial Plan Endorsement, and attached thereto and forming a part of the Policy which describes the **Clean-Up** to be undertaken at the **Insured Property**, and, to the extent described therein, at areas beyond the boundaries of the **Insured Property** and any government mandated changes thereto.

CC.  **Rental Value** means the:

    1.  Total anticipated rental income from tenant occupancy of the **Insured Property** as furnished and equipped by the **Insured**;

    2.  Amount of all charges that are the legal obligation of the tenant(s) pursuant to a lease and that would otherwise be the **Insured's** obligations; and

    3.  Fair rental value of any portion of the **Insured Property** that is occupied by the **Insured** during the **Period of Restoration**, less any rental income the **Insured** could earn:

        a.  by complete or partial rental of the **Insured Property**, or

        b.  by making use of other property on the **Insured Property** or elsewhere.

DD.  **Responsible Insured** means the manager or supervisor of the **Named Insured** responsible for environmental affairs, control or compliance, or any manager of the **Insured Property,** or any officer, director or partner of the **Named Insured.**

EE.  **Restoration Costs** means reasonable and necessary costs incurred by the **Insured** with the Company's written consent, which consent shall not be unreasonably withheld or delayed, to repair, replace or restore real or personal property to substantially the same condition it was in prior to being damaged during work performed in the course of incurring **Clean-Up Costs.** However, such **Restoration Costs** shall not exceed the net present value of such property prior to incurring **Clean-Up Costs. Restoration Costs** do not include costs associated with improvements or betterments.

FF.  **Self-Insured Retention** means the amount of **Clean-Up Costs** stated in Item 3 of the Declarations.

GG.  **Scheduled Contractor** means a remediation contractor approved by the Company and scheduled on the Definition of Scheduled Contractor Endorsement.

HH.  **Termination Date** means, with respect to Coverages K and L, the earliest of the following:

    1.  With respect to Coverage K:

        (a)  the date set forth in Item 9 of the Declarations;

        (b)  The ending date of the period set forth in Item 2 of the Declarations;

        (c)  The date the Limit of Liability shown in Item 3 of the Declarations for Coverage K is exhausted;

        (d)  The date the **Insured** receives written approval from the governmental entity or quasi-governmental entity responsible for supervision of the Clean-Up that **Clean-Up** has been completed in accordance with the **Remedial Plan**, or the date the **Remedial Plan** is complete

Copyright, American International Group, Inc. ®2000

pursuant to the requirements of any applicable state voluntary cleanup agreement or program; or

    (e)  Cancellation of the Policy pursuant to Section VI., paragraph G.

2.  With respect to Coverage L:

    (a)  The date the Limit of Liability shown in Item 3 of the Declarations for Coverage L is exhausted;

    (b)  The date the **Insured** receives written approval from the governmental entity or quasi-governmental entity responsible for supervision of the **Clean-Up** that **Clean-Up** has been completed in accordance with the **Remedial Plan**, or the date the **Remedial Plan** is complete pursuant to the requirements of any applicable state voluntary cleanup agreement or program; or

    (c)  Cancellation of the Policy pursuant to Section VI, Paragraph G.

The **Termination Date** shall not be extended by the exercise of any rights held by a governmental entity or quasi-governmental entity to reopen, reconsider or otherwise cause the **Insured** to perform **Clean-Up** after previously having approved or acknowledged that the **Remedial Plan** has been completed.

**II.**  **Transportation** means the movement of **Transported Cargo** by a conveyance, from the place where it is accepted by a carrier until it is moved:

1.  to the place where the carrier finally delivers it; or

2.  in the case of waste, to a waste disposal facility to which the carrier delivers it.

**Transportation** includes the carrier's loading or unloading of **Transported Cargo** onto or from a conveyance provided that the loading or unloading is performed by or on behalf of the **Named Insured.**

**JJ.**  **Transported Cargo** means goods, products, or waste transported for delivery by a carrier properly licensed to transport such goods, products, or waste.

**KK.**  **Underground Storage Tank** means any tank that has at least ten (10) percent of its volume below ground, in existence at the **Inception Date**, or installed thereafter, including associated underground piping connected to the tank.

IN WITNESS WHEREOF, the Company has caused this Policy to be signed by its Chairman of the Board and CEO and Secretary and signed on the Declarations by a duly authorized representative or countersigned in states where applicable.

_Elizabeth M. Tuck_
        Secretary

_L. H. Lilley_
        Chairman of the Board and CEO

# EXHIBIT "4"

# GREKA ENERGY

_Transmitted via Fax No. (212) 344-2761 and overnight delivery_

June 26, 2007

Manager, Pollution Insurance Products Unit
AIG Technical Services, Inc.
Environmental Claims Department
80 Pine Street, Sixth Floor
New York, NY 10005

      Re:    Pollution Legal Liability Select® Clean-Up Cost Cap Insurance
               Policy No. 8087804

Dear Sir / Madam:

On behalf of the named insured, Greka Oil & Gas, Inc., notice (and as applicable, supplemental notice to previously noticed claims and/or possible claims) is hereby provided of attached pollution conditions, claims, pollutants, and possible claims pursuant to Article III of the above-referenced policy. Where not previously provided by AIG, please advise of the claim number and the name of the handling adjuster for each of the claims and possible claims listed in the attachment.

Potential claimants further include the additional insureds identified in Endorsement No. 2 to the policy who may also be subject to the claims and possible claims.

Greka understands that it has complied with the notice obligations under the policy in advising AIG of each of the claims and possible claims listed in the attachment hereto. Greka will continue to provide AIG with information as it becomes available and to the best of Greka's ability.

If you have any questions or desire additional information from Greka, please let me know.

Sincerely,

Susan M. Whalen
Sr. Vice President and General Counsel

cc:    Insurance Management Associates of Colorado, Inc.
       1550 17th Street, Suite 600
       Denver, CO 80202

Attachment to June 26, 2007 Notice to AIG Technical Services, Inc.
Re:    Pollution Legal Liability Select® Clean-Up Cost Cap Insurance
        Policy No. 8087804

| Insured Property or other location where the pollution conditions took place | Names of persons with knowledge of the pollution conditions or pollutants | Time, place, cause, nature of and other circumstances of the pollution conditions or pollutants by which Insured first became aware of claim or possible claim | Demands, summonses, notices or other papers filed with court, agency or investigative body * | Bodily injury, property damage or clean-up costs which resulted or may result from such pollution conditions | Engineering information available on the pollution conditions |
|---|---|---|---|---|---|
| Cat Canyon Field | Current / former employees, consultants and contractors of Vintage, Greka | Ucal - (attached) pile remediation | CRWQCB | Clean up costs | On file |
| | | Ucal – No. 46 clean up | SBCFD | Clean up costs | On file |
| | | Security - (attached) pile remediation | CRWQCB | Clean up costs | On file |
| | | Goodwin - (attached) pile remediation | CRWQCB | Clean up costs | On file |
| | | Harbord – (attached) pile remediation | CRWQCB | Clean up costs | On file |
| | | Cal - (attached) pile remediation | CRWQCB | Clean up costs | On file |
| | | Cal - KD spill clean up | | Clean up costs; property damage | On file |
| | | Ucal, Cal, Bradley – well plug and abandonment site restoration | Calif Superior Court | Clean up costs; property damage | |
| Los Flores Field | | | | | |
| Clark Ave. Field | Current / former employees, consultants and contractors of Vintage, Greka | Nicholson a.k.a. Portwood - sump clean up | American Arb Assn | Clean up costs | On file |
| Santa Maria Valley Field | Current / former employees, consultants and contractors of Vintage, Greka | Bradley 3 Island sand pit - (attached) pile remediation | CRWQCB | Clean up costs | On file |
| Zaca Field | Current / former employees, consultants and contractors of Vintage, Greka | Davis - (attached) tank battery pile remediation | CRWQCB | Clean up costs | On file |
| | | Davis - 12/05 spill clean up | USEPA | Clean up costs; property damage | |
| | | Chamberlin - (attached) KD tank battery pile remediation | CRWQCB | Clean up costs | On file |
| | | Zaca - 14-well plug and abandonment | | Clean up costs | On file |

* USEPA = United States EPA
CRWQCB = California Regional Water Quality Control Board
SBCFD – Santa Barbara County Fire Department

| | Location | APN | Latitude | Longitude |
|---|---|---|---|---|
| | **NORTH BELRIDGE CANYON AREA** | | | |
| 1 | Ucal 46 pile | 129-180-018 | 34.5114 | -120.1925 |
| 2 | Ucal Omni pile | 129-180-018 | 34.5119 | -120.1923 |
| 3 | Ucal Edmonston pile | 129-180-018 | 34.5122 | -120.1922 |
| 4 | Security 5 (Vintage) pile | 129-170-008 | 34.5150 | -120.1950 |
| 5 | Security 5-5R pile | 129-170-008 | 34.5141 | -120.1950 |
| 6 | Security 6 (Portwood) pile | 129-170-008 | 34.5133 | -120.1955 |
| 7 | Security 9 (Portwood) pile | 129-170-008 | 34.5132 | -120.1955 |
| 8 | Security 22R (Vintage) pile | 129-170-008 | 34.5132 | -120.1955 |
| 9 | Security 27 (Vintage) pile | 129-170-008 | 34.5134 | -120.2004 |
| 10 | Security 30 (Vintage) pile | 129-170-008 | 34.5139 | -120.1957 |
| 11 | Goodwin 27 pile | 129-170-008 | 34.5210 | -120.2007 |
| 12 | Harbordt 6-15 (Vintage) pile | 129-180-004 | 34.5156 | -120.1926 |
| 13 | Harbordt 7-12 (Vintage) pile | 129-180-004 | 34.5207 | -120.1920 |
| 14 | Harbordt 12-15 (Vintage) pile | 129-180-004 | 34.5157 | -120.1907 |
| 15 | Harbordt 58 (Vintage) pile | 139-180-004 | 34.5168 | -120.1914 |
| 16 | Harbordt Sand Pits | 129-180-004 | 34.5208 | -120.1851 |
| 17 | Goodwin 30 Pile | 129-170-008 | 34.5247 | -120.1959 |
| 18 | Cal 21 pile | 129-180-017 | 34.5136 | -120.1855 |
| | | 101-030-016 | 34.4947 | -120.1931 |
| | | 101-030-016 | 34.4954 | -120.1925 |
| | | 101-060-052 | 34.4939 | -120.1930 |
| | | 101-060-052 | 34.4843 | -120.1853 |
| | | 101-030-011 | 34.5029 | -120.1924 |
| | | 101-030-011 | 34.5014 | -120.1927 |
| | | 101-030-011 | 34.5012 | -120.1930 |
| | | 101-060-052 | 34.4841 | -120.1920 |
| | | 101-070-004 | 34.4849 | -120.1732 |
| | | 101-070-004 | 34.4854 | -120.1720 |
| | **SANTA MARIA VALLEY FIELD** | | | |
| 29 | Bradley 3 Island Sand Pit Pile | 129-010-011 | 34.5312 | -120.2331 |
| | | 107-150-002 | 34.5326 | -120.2420 |
| | | 113-150-020 | 34.5554 | -120.3012 |
| | | 113-270-004 | 34.5114 | -120.3105 |
| | | 113-270-004 | 34.5110 | -120.3103 |
| | | 113-270-004 | 34.5122 | -120.3049 |
| | | 113-250-002 | 34.5115 | -120.3023 |
| | **ZACA FIELD** | | | |
| 36 | Davis Tank Battery pile | 133-151-005 | 34.4337 | -120.0853 |
| 37 | Chamberlin KO TB pile | 133-151-058 | 34.4350 | -120.0916 |

# EXHIBIT "5"

# GARRISON LAW CORPORATION

*Via US Mail & Facsimile*

August 22, 2008

Jeffrey D. Cooper
Executive General Adjuster
Crawford Technical Services
3100 Oak Road, Suite 207
Walnut Creek, CA, 94597
Facsimile: (925) 945-8752

Paul Lafferty
Senior Claims Adjustor, AIG
175 Water Street, 29th Floor
New York, NY, 10038
Facsimile: (866) 254-7193

Joshua Levine
Dongell Lawrence Finney LLP
707 Wilshire Boulevard, 45th Floor
Los Angeles, CA, 90017
Facsimile: (213) 943-6101

Mary P. McCurdy
McCurdy & Fuller, LLP
4300 Bohannon Drive, Suite 240
Menlo Park, CA, 94025
Facsimile: (650) 618-3599

> **RE: Insured has provided files and bates stamped documents with comprehensive index matrix for covered claims under multiple AIG policies and multiple years; See Attached Preliminary Claims Matrix and Insurance Archeology; and Demand for Payment of Defense Costs Past Due & Paid/Policy Limits**

Dear AIG Related Adjustors & Attorneys:

This correspondence follows your insured's multiple letters and emails exchanged with your companies in your insured's compliance with your various requests for information. This also follows Garrison Law Corporation's (GLC) several letters to have past due and paid defense costs properly reimbursed. Demand is now for policy limits, in consideration of past due and paid defense costs, indemnification including value of CFA, and other issues tendered for payment, including the Bell Lease, Zaca, Bradley 3 Island and Portwood claims (see attached Claims Matrix).

Greka letter to AIG
August 22, 2008
Page 2

During this same period, the insured and its counsel prepared for trial set for June 30, 2008. During this same time period and now, Greka was and is pressed for defense resources due and owing under its policies. During this same time period, GLC repeatedly requested payment of submitted invoices for defense costs and related expenses. During this same time period, the insured has not received a single penny, despite laying out additional hundreds of thousands of dollars in legal costs and expenses. Moreover, your insured's compliance with your multiple and expanding requests served as an unfortunate diversion of important, limited resources and finances. This diversion, coupled with your failure to pay for out of pocket defense costs, exacerbated an already very difficult situation for your insured.

Per our letters to you dated June 13, 2008 and June 24, 2008, "we provided AIG with the documents that it sought, using IKON, a professional copy service, to expedite the shipments of the requested boxes of documents." In addition, on June 13, 2008, GLC provided invoices for work of prior counsel, long since completed and paid for by Greka. To date, as previously stated, Greka has yet to receive a penny in reimbursed defense costs. Greka desperately continues to seek these covered reimbursements. These unreasonable delays have prejudiced your insured and have resulted in a *de facto* denial of covered claims.

On July, 21, 2008, you asked for three enumerated additional document related requests. One "(1)" was for an "inventory of documents that you previously promised to provide." You gave until the next day "July 22, 2008" to comply with all three categories of demands. We continued to work with you and complied with all of your new and adjusted information requests.

On July 29, 2008, you again affirmed that you agreed to provide a defense. You stated "AISLIC accepted the defense of the action no later than December of 2005. AISLIC is and has been providing a full and complete defense of Greka." We again stated that payment of invoices was critical to the defense of Greka and failure to do same would be prejudicial to Greka. It is not enough to merely state that you are providing a full and complete defense, when in fact the covered insured has not received a penny of defense cost reimbursement to date.

Greka letter to AIG
August 22, 2008
Page 3

On August 5, you "were glad to hear the remaining documents will . . . be made for copying." On August 6, 2008, we had an emergency meeting wherein we again stressed the need for immediate payment of past due defense invoices as critical to Greka.

On August 8, 2008, you "reviewed several deposition transcripts at Mr. Sanger's office." On August 11, 2008, you determined that you wished to see depositions of expert witnesses and other depositions totaling thousands of dollars and thousands of pages in the Wells Fargo/Union Bank matter. You asked us to advance that money for costs related to same as well. Same was again made available to you.

On August 13, 2008, we again warned you that "additional delays in payment will be immitigable and punitive. Greka's ability to mount a defense and continue operations continues to be severely impacted."

On August 21, 2008, after you received volumes of documents consisting of multiple banker boxes, computer disks, and deposition information, you stated that we only provided "limited information" and that you are not able to determine issues "in a vacuum." You continue to refuse to provide a defense to Greka or payment of past due and paid defense costs.

You also stated on August 21, that you have "asked repeatedly for the information as to the status of the matter, with no response thereto" and that "Greka entered into settlement with Wells Fargo, without any notice to AIG or AIG's consent."

Please, there are multiple attorneys and multiple law firms related to AIG involved in this matter. You had counsel attending the trial. The insured has provided you thousands and thousands of pages of materials in multiple banker boxes and multiple disks. The insured has met with you repeatedly. The insured has exchanged endless letters with more and more requirements. You have received far more than "limited information." More accurately, you have received extensive background and up to the minute current information about the Wells Fargo matter and other covered claims under the policies.

Greka letter to AIG
August 22, 2008
Page 4

It must also be noted that AIG's failure to provide defense reimbursement and litigation support did naturally have a corresponding and prejudicial effect on Greka's trial preparation and settlement posture. In addition, to underscore the completeness and comprehensiveness of the documents that the insured has previously provided to you, please review the attached matrix of the 18 boxes which references the corresponding Bate stamp numbers. The 18 boxes have been copied onto 5 disks that are also referenced in the matrix. These boxes have been continuously copied by IKON from June to August. To the extent that multiple adjusters have made multiple requests, this letter seeks to coordinate your insured's production of these documents.

As stated per our email dated August 21, 2008, "Greka is still seeking payments for defense costs" for a range of matters, and defense and indemnification regarding the Wells Fargo/Union Bank matter. Your immediate payment of past due and paid invoices that we submitted to you on June 13, 2008, August 14, 2008, and August 15, 2008 would be a positive step toward mitigation of damages. We note that your insured has been expecting and has relied upon this payment, based upon your statements and promises of payment. We acknowledged your constant reassurance that AIG is "providing a full and complete defense of Greka." We edited the invoices with you regarding your maximum allowable attorney hourly pay rates with further expectation and implication of pending payment.

Demand is for policy limits, in consideration of past due and paid defense costs, indemnification and other issues tendered for payment.

Sincerely yours,

**GARRISON LAW CORPORATION**

Gregg S. Garrison, REA & CEI
*Licensed in California, Texas & Washington D.C.*
Enclosures (as stated)
Hk/GSG

Plaza Linda Vista
Suite 100   1525 State Street   Santa Barbara, California 93101
*Phone* (805) 957-1700   *Fax* (805) 957-1709

# EXHIBIT "6"



**AIG** AIG Domestic Claims, Inc.

## PIP Claims Department

101 Hudson Street, 31st Floor
Jersey City, NJ 07302
Phone # (201) 631-7369
Fax #    (201) 631-5052

RECEIVED
DEC 05 2005
IMA/CO

<u>CERTIFIED MAIL RETURN RECEIPT REQUESTED</u>

December 1, 2005

Todd McRae
IMA
1550 17th Street
Suite 600
Denver, CO 80202-1657

| | | |
|---|---|---|
| RE: | Insured: | Greka Energy Corporation |
| | Additional Named Insured: | Vintage Petroleum, Inc. |
| | Site: | Various |
| | Location: | Santa Barbara, CA |
| | Claimant: | Wells Fargo Bank, N.A. et al |
| | Suit: | <u>Wells Fargo Bank, N.A. et al v. Vintage Petroleum, Inc. et al</u> |
| | Policy: | PLS/CCC 8087804 (eff: 6/26/2002 to 6/26/2007) |
| | Coverages Purchased: | A, B, C, D, E, F and K and L Combined |
| | Claim: | 182-076997 |

<u>ACCEPTANCE OF DEFENSE</u>

Dear Mr. McRae:

AIG Domestic Claims ("AIGDC") is the authorized representative of American International Specialty Lines Insurance Company ("AISLIC"). This office previously acknowledged receipt of the notice of claim with respect to the above-referenced matter tendered on behalf of the Greka Energy Corporation. ("Greka"). Please be advised that I am handling this matter and all correspondence regarding it should be sent to my attention.

Greka was issued Pollution Legal Liability Select Clean-Up Cost Cap Insurance policy numbered PLS/CCC 8087804 effective from June 26, 2002 to June 26, 2007. Based on our review of the facts and circumstances provided, please be advised AISLIC accepts defense of this claim under policy PLS/CCC 8087804 subject to a reservation of rights and the $100,000 deductible.

Greka Energy Corporation
12/1/2005
2

According to the information received, a lawsuit was filed in the Superior Court of California for the County of Santa Barbara naming Greka, Vintage Petroleum, Inc. ("Vintage") and others as defendants. In their complaint plaintiffs, Wells Fargo Bank, N.A. and Union Bank of California, N.A, trustees of the Cat Canyon site located in Santa Barbara, CA ("the site"), assert fourteen causes of action against the various defendants including the insured, Aera Energy, and 60 Does. The defendants, lease holders, extract oil and gas from the site. Some of the causes of action allege pollution conditions and the others are related to property rights in the Cat Canyon Property. Plaintiffs allege that Greka and the other named defendants did wrongfully and unlawfully caused or permitted environmental contaminants to be released, discharged or maintained on, within or under the site. Plaintiffs additionally allege that defendant Vintage did cause there to be deposited on the site junk, debris and contamination and are asserting causes of action. Plaintiff seeks declaratory relief, compensatory, treble and punitive damages. Plaintiffs allege that old sumps and other areas have been impacted with hydrocarbon contamination. In addition, abandoned pipelines other oil field facilities, junk and debris litter the site. Plaintiff alleges:

FOURTH CAUSE OF ACTION
(For permanent Nuisance, Against all Defendants)
Plaintiffs allege that defendants have wrongfully caused or permitted environmental contaminants to be released, discharged or maintained on, within or under the site. Plaintiffs allege that contamination was not illegal at the time or exceed permitted uses at the time it occurred, continuing maintenance and disposal constitutes a nuisance and interfere with the comfort and enjoyment by Plaintiff Trustees of their land. Plaintiffs allege that the site has not been restored, despite their requests. Plaintiffs seek punitive damages from each defendant.

FIFTH CAUSE OF ACTION
(For Continuing Nuisance, against all Defendants)
Plaintiffs allege that defendants have wrongfully caused or permitted environmental contaminants to be released, discharged or maintained on, within or under the site. Plaintiffs allege that contamination was not illegal at the time or exceed permitted uses at the time it occurred, continuing maintenance and disposal constitutes a nuisance and interfere with the comfort and enjoyment by Plaintiff Trustees of their land. Plaintiffs allege that the site has not been restored, despite their requests. Plaintiffs seek punitive damages from each defendant.

SIXTH CAUSE OF ACTION
(For Permanent Trespass, against all Defendants)
Plaintiffs allege that defendants have wrongfully caused or permitted environmental contaminants to be released, discharged or maintained on, within or under the site. Plaintiffs allege that some or all of the conditions are not capable of being abated and are permanent conditions on the site. Plaintiffs seek punitive damages from each defendant.

Greka Energy Corporation
12/1/2005
3

SEVENTH CAUSE OF ACTION
(For Continuing Trespass, against all Defendants)
Plaintiffs allege that defendants have wrongfully caused or permitted environmental contaminants to be released, discharged or maintained on, within or under the site. Plaintiffs allege that some or all of the conditions are not capable of being abated and are permanent conditions on the site. Plaintiffs allege that the site has been damaged in that they will incur costs to assess, evaluate, and test the conditions resulting in trespass and to restore the site to its original condition. Plaintiffs seek punitive damages from each defendant.

Policy PLS/CCC 8087804 is a claims-made and reported policy, with effective dates of June 26, 2002 to June 26, 2007. The policy limits are $10,000,000 each incident and $10,000,000 in the aggregate. The deductible is $100,000 each incident.

The policy provides in pertinent part:

I.     INSURING AGREEMENT

COVERAGE C – THIRD PARTY CLAIMS FOR ON-SITE BODILY INJURY AND PROPERTY DAMAGE

1.     To pay on behalf of the **Insured**, **Loss** that the Insured becomes legally obligated to pay as a result of **Claims** for **Bodily Injury** or **Property Damage** resulting from **Pollution Conditions** on or under the **Insured Property**, if such **Bodily Injury** or **Property Damage** takes place while the person injured or property damaged is on the **Insured Property**, provided such **Claims** are first made against the **Insured** and reported to the Company in writing during the **Policy Period**, or during the **Extended Reporting Period** if applicable.

2.     LEGAL EXPENSE AND DEFENSE

       The Company shall have the right and duty to defend any Claims covered under Coverages A through I provided the named Insured has purchased such Coverage. The Company's duty to defend or continue defending any such Claim, and to pay any Loss, shall cease once the applicable limit of liability, as described in Section V. LIMITS OF COVERAGE; DEDUCTIBLE has been exhausted. Defense costs, charges and expenses are included in Loss and reduce the applicable limit of liability, as described in Section V., and are included within the Deductible amount for the Coverage Section that applies and is shown in Item 3 of the Declarations.

       *                    *                    *

The policy contains the following relevant definitions:

VII.   DEFINITIONS

Greka Energy Corporation
12/1/2005
4

M.     **Insured** means the **Named Insured**, and any past or present director, officer, partner
        or employee thereof, including a temporary or leased employee, while acting within
        the scope of his or her duties as such.

O.     **Insured Property** means with respect to Coverages A through J, each of the
        locations identified in Item 5(a) of the Declarations, and with respect to Coverages K
        and L, each of the locations identified in Item 5(b) of the Declarations.

        Item 5a &5b: INSURED PROPERTY(S)
        1.     Cat Canyon Field
        2.     Loss Flores Field
        3.     Clark Avenue Field
        4.     Santa Maria Valley Field
        5.     Zaca Field
        6.     Harbordt Property Pile, Remediation
        7.     UCAL Property Pile, Remediation

Q.     **Loss** means, under the applicable Coverages: 1. monetary awards or settlements of
        compensatory damages; where allowable by law, punitive, exemplary, or multiple
        damages; and civil fines, penalties, or assessments for **Bodily Injury** or **Property
        Damage**; 2. costs, charges and expenses incurred in the defense, investigation or
        adjustment of **Claims** for such compensatory damages or punitive, exemplary or
        multiple damages, and civil fines, penalties or assessments, or for **Clean-Up Costs**;
        or 3. **Clean-Up Costs**.

U.     **Pollution Conditions** [per endorsement No. 11] means the discharge, dispersal,
        release or escape of any solid, liquid, gaseous or thermal irritant or contaminant,
        including smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, medical waste
        and waste materials into or upon land, or any structure on land, the atmosphere or
        any watercourse or body of water, including groundwater, provided such conditions
        are not naturally present in the environment in the amounts and concentrations
        discovered. Pollution Conditions shall not include Microbial Matter.

AA.    **Property Damage** means:

        1.     Except with respect to Coverage C, physical injury to or destruction of
               tangible properties of parties other than the Insured, including the resulting
               loss of use and diminution in value thereof;

        2.     Loss of use, but not diminution in value, of tangible property of parties other
               than the Insured that has not been physically injured or destroyed;

        3.     Solely with respect to Coverage C, physical injury to or destruction of
               tangible property of  parties other than the Insured, including the resulting
               loss of use thereof; and

Greka Energy Corporation
12/1/2005
5

    4.      Natural Resource Damage.

The policy contains the following relevant endorsements:

ENDORSEMENT NO. 7

KNOWN CONTAMINANT EXCLUSION ENDORSEMENT

For Coverages A-F, K and L, it is hereby agreed that this insurance does not apply to Clean-Up Costs, Claims, Loss, Actual Loss, Extra Expense or loss of Rental Value due to or arising from decommissioning and disposal of oilfield-related equipment such as, but not limited to, pumping equipment, pipelines, concrete pads, tanks, gas plants, concrete.

ENDORSEMENT NO. 8

KNOWN CONTAMINANT EXCLUSION ENDORSEMENT

As applies to Coverages A-F, it is hereby agreed that this insurance does not apply to Clean-Up Costs, Claims, Loss, Actual Loss, Extra Expense or loss of Rental Value due to Pollution Conditions arising from well blowouts and Pollution Conditions or Pollutants that are subject to the Remedial Plan and specified under coverage K and L for scheduled locations.

Endorsement No. 7 states that this insurance does not apply to Clean-Up Costs, Claims, Loss, Actual Loss, Extra Expense or loss of Rental Value due to or arising from decommissioning and disposal of oilfield-related equipment such as, but not limited to, pumping equipment, pipelines, concrete pads, tanks, gas plants, concrete. To the extent that this claim is for Clean-Up Costs, Claims, Loss, Actual Loss, Extra Expense or loss of Rental Value due to or arising from decommissioning and disposal of oilfield-related equipment such as, but not limited to, pumping equipment, pipelines, concrete pads, tanks, gas plants, concrete, there would be no coverage. AISLIC reserves the right to rely on Endorsement No. 7 to deny coverage for this claim.

Endorsement No. 8 states that this insurance does not apply to Clean-Up Costs, Claims, Loss, Actual Loss, Extra Expense or loss of Rental Value due to Pollution Conditions arising from well blowouts and Pollution Conditions or Pollutants that are subject to the Remedial Plan and specified under coverage K and L for scheduled locations. To the extent that this claim is for Clean-Up Costs, Claims, Loss, Actual Loss, Extra Expense or loss of Rental Value due to Pollution Conditions arising from well blowouts and Pollution Conditions or Pollutants that are subject to the Remedial Plan and specified under coverage K and L for scheduled locations, there would be no coverage. AISLIC reserves the right to rely on Endorsement No. 8 to deny coverage for this claim.

The plaintiffs included fourteen causes of action in their Complaint including breach of contract. AISLIC policy number 8087804 does not provide coverage breach of contract. In addition, Causes of Action eighth through fourteenth allege improper conversion, wasteful extraction, wrongful occupation, lease termination. AISLIC policy number 8087804 does not provide coverage for Causes of Action which allege improper conversion, wasteful

Greka Energy Corporation
12/1/2005
6

extraction, wrongful occupation, and lease termination. AISLIC reserves the right to deny coverage for the Causes of Action that include improper conversion, wasteful extraction, wrongful occupation and lease termination

If you have documentation or obtain further information with respect to the claim that you have presented which indicates that coverage should be afforded under the policy for the Causes of Actions that were denied, such documentation should be provided to the undersigned at the earliest opportunity. Review of such documentation or information is without waiver of AISLIC's denial of coverage and is made under a full Reservation of Rights to supplement the Company's denial of the specific Causes of Action letter.

Please be advised that nothing contained herein should be construed as a waiver of any rights or defenses, whether or not stated herein, which AISLIC may possess under the AISLIC policy and/or applicable law. It should be understood further that any actions taken by AISLIC and/or its agents, representatives or attorneys do not constitute and are not intended as a waiver of any rights or defenses available to AISLIC, whether or not stated herein, that may be available now or at any point in time. AISLIC reserves its right to supplement and/or amend its coverage position at any time.

If you should have any questions regarding the foregoing, please do not hesitate to contact the undersigned directly at 201.631.7369, or by facsimile at 201.631.5052.


Very truly yours,

Nicholas Capuano
Home Office Supervisor
AIG Domestic Claims


Insurance Management Associates of Colorado, Inc.
1550 17th Street, Suite 600
Denver, CO 80202

# EXHIBIT "7"



# McCurdy & Fuller LLP

4300 Bohannon Drive, Suite 240
Menlo Park, California 94025
Phone: (650) 618-3500
Fax: (650) 618-3599
www.mccurdylawyers.com

Mary P. McCurdy                    July 29, 2008                    (650) 618-3501

**VIA U.S. MAIL & EMAIL**

Gregg S. Garrison, Esq.
Garrison Law Corporation
1525 State Street, Suite 100
Santa Barbara, CA 93101

      Re:   *Wells Fargo Bank, et al. v. Greka Energy, et al.*
           Santa Barbara County Superior Court Case No. 1155864
           Insured:    Greka Energy Corp.
           Claim No.:  182-093161

Dear Mr. Garrison:

We have reviewed your letters of June 13 and June 24, 2008 with various enclosures. We take this opportunity to more fully respond to the points and assertions contained therein.

You assert that Greka Energy Corporation ("Greka") objects to "voluminous and extensive document requests . . . a month prior to trial [that seem] ill-timed to the detriment" of Greka. In fact, AIG Domestic Claims ("AIGDC") was left with no choice but to seize the initiative and seek the necessary documents to try to develop its own evaluation concerning the damages claimed by the plaintiffs and Greka's potential exposure for such damages.

Although it has been approximately two and one-half years since AIGDC accepted the defense of this action, AIGDC has never been provided with a substantive analysis from defense counsel concerning Greka's potential exposure for liability and damages. Over the past two years, there have been no less than 10 written requests directed to Greka and/or its attorneys for information and analysis regarding liability and damages. Every time those requests have been ignored.

Your June 13· 2008 letter raises the issue of additional claims. After Susan Whalen faxed information regarding potential additional claims on June 26, 2007, Stacy Parker of AIGDC placed a number of telephone calls seeking information from Ms. Whalen, which she acknowledged in a letter dated September 9, 2007. Through the end of 2007 there were no less than four e-mail and fax requests to Ms. Whalen seeking more information about not only the Wells Fargo case but all of the claims set forth in the June 26, 2007 correspondence. Earlier this year, Zachary Barth made several more written

29071

Gregg S. Garrison, Esq.
Re:    *Wells Fargo Bank, et al. v. Greka Energy*
July 29, 2008
Page 2 of 4

requests to Flavio Parigi for information regarding those additional claims. No
information was provided.

As you know, the AISLIC policy requires that the insured cooperate with the
company and offer "all reasonable assistance" in the investigation and defense of claims.
AIGDC should never have been placed in the position of sending a demand for
information from the insured because AIGDC should have been receiving regular,
periodic status reports and should have been kept aware of the posture of the case, of
significant events in the case, and of defense counsel's best analysis of the liability and
damages exposure faced by Greka. This lack of cooperation from the insured ultimately
works to the detriment of the insured because the insurance carrier, on the eve of trial,
does not have sufficient information concerning the potential liability of the insured to
determine whether or not a proposed settlement both falls within the scope of the carrier's
indemnity obligation and is otherwise reasonable.

This is exactly the position that Greka has put AIGDC in here, as you implicitly
acknowledge by stating that AIGDC cannot reasonably deny coverage "absent so many
key documents." By the same reasoning, AIGDC cannot reasonably be expected to
indemnify Greka when AIGDC has no information supporting the extent of Greka's
liability or the nature and scope of any damages that may be awarded against Greka.

In a similar vein, your June 24, 2008 letter enclosed two "estimates" for trial
experts. Please provide details regarding these experts. On what issues will they be
opining at trial? Who are the plaintiffs retaining on the other side? What preparatory
work has been done? Because AIGDC has been denied fundamental information about
the claims asserted in the Phase II trial, it is in no position to assess the reasonableness of
the use and cost of these experts.

You contend that AIGDC's document requests are duplicative of documentation
already in AIGDC's possession. As Mr. Barth has already made clear, his March 24,
2008 representation that he has all "court filings" was a reference to items that he could
download off the court website. Mr. Barth has no way of knowing whether he has
obtained all relevant pleadings and has certainly had not access to any of the discovery in
this matter.

As to the complaint that AIGDC has not responded to Greka's concerns regarding
claim bifurcation, it is my understanding that Mary McCurdy has already explained to
you that the Vintage claims operations are kept separate from the Greka claims operations
because of a possible conflict between the two insureds.

Your June 24, 2008 letter complains that invoices submitted on June 13, 2008
have not yet been paid and suggests that AIGDC's failure to pay could be in "bad faith."
This is patently unreasonable for a number of reasons.

29071

Gregg S. Garrison, Esq.
Re:    *Wells Fargo Bank, et al. v. Greka Energy*
July 29, 2008
Page 3 of 4

Greka failed to tender these attorneys' fees invoices to AISLIC after its deductible
was exhausted. In fact, AIGDC never received any attorneys' fee invoices until your
letter of June 13, 2008. Greka has only itself to blame for any delay in processing its
claims for reimbursement of defense fees.

Moreover, AIGDC advised Jeff Valle in April 2006 that the most AIGDC would
pay for hourly defense rates was the equivalent of the hourly rates that AIGDC typically
pays to defend suits of a similar nature in the same geographical region. Mr. Valle was
told that those rates were $220 per hour for partners and $170 per hour for associates.
Ms. Whalen was reminded of the fee limitation in a February 27, 2007 letter from Ms.
Parker. Meanwhile Mr. Valle went along billing himself at $390 per hour and his
associate at $350 per hour. Mr. Sanger's firm has billing rates that vary from $245 per
hour to $400 per hour.

Please note Condition E of the policy which provides:

> Voluntary Payments – No Insured shall voluntarily enter into any
> settlement or make any payment or assume any obligation unless in
> response to an emergency or pursuant to Environmental Laws that
> require immediate remediation of Pollution Conditions or
> Pollutants, without the Company's consent which shall not be
> unreasonably withheld, except at the Insured's own cost.

To the extent that Greka agreed to pay Valle & Associates or Sanger & Swysen
rates higher than those identified by AIGDC, any cost differential is the sole
responsibility of Greka.

Your June 24 letter states that Greka has "indisputably presented a potentially
covered claim." While we may differ as to whether potential coverage is "indisputable,"
the fact is that AISLIC accepted the defense of the action no later than December of 2005.
AISLIC is and has been providing a full and complete defense to Greka.

Finally, we note that you have not presented any factual data relevant to the
impediments to coverage that are identified in our May 28, 2008 letter.

For all of the foregoing reasons, your unctuous accusations of bad faith are
unjustified.

We understand that your office has unilaterally decided to discontinue IKON's
access to Greka's case files and that no further copying is being permitted. Please note
that in addition to the requirement that the insured "offer all reasonable assistance in the
investigation and defense of Claims" the policy contains Condition J, entitled Access to
Information, which provides:

29071

Gregg S. Garrison, Esq.
Re:    *Wells Fargo Bank, et al. v. Greka Energy*
July 29, 2008
Page 4 of 4

          The Named Insured agrees to provide the Company with
          access to any information developed or discovered by the
          Insured concerning Loss or Clean-Up Costs covered under
          this policy, whether or not deemed by the Insured to be
          relevant to such Loss or Clean-Up Costs and to provide the
          Company access to interview any Insured and review any
          documents of the Insured.

     Greka's refusal to allow AIGDC access to documents and information concerning
the *Wells Fargo* litigation is a breach of policy conditions and materially impairs
AIGDC's ability to evaluate the claims against Greka. AIGDC reserves the right to deny
coverage to Greka on the grounds that it has failed to comply with its obligations under
the policy.

     This letter and any further activity by AIGDC on this matter are subject to a full
and complete reservation of all of AISLIC's rights under the policy, at law and in equity.

                   Very truly yours,

                   Mary P. McCurdy

29071

# EXHIBIT "8"

# Garrison Law Corporation

August 14, 2008

*Via U.S. Mail & Email*

McCurdy & Fuller
Mrs. Mary McCurdy, Esq.
4300 Bohannon Drive, Suite 240
Menlo Park, CA, 94025
Telephone: (650) 618-3500
Facsimile: (650) 618-3599

**Re:    Tender of Defense Costs & Reimbursement Demand for Claim Number 182-093161**

Dear Mrs. McCurdy

Thank you for your letter regarding Greka's insurance claim for attorney's and expert fees under their AIG policy that is associated with the *Wells Fargo Bank, et al. v. Vintage Petroleum* case. Pursuant to our recent teleconference and correspondence, our office has worked with AIG in good faith and has provided AIG with access to the IKON files to assist the investigation and defense of the claim made.

This letter is formal written notice of Greka's tendering of defense costs associated with the claim. Enclosed herewith are the attorney's and expert fees that have been undertaken in defense of the litigation. Greka demands immediate payment of these defense costs.

For purposes of receiving a minimum payment to reimburse our client in the interim, we have provided you with the numbers you agreed to pay in your July 29th letter. However, we specifically reserve our right to revisit the issue of attorney's and expert fees that are covered in the policy, and do not waive any rights by agreeing to accept an immediate payment of defense costs.

## Attorney's Fees

Per your July 29th letter we have calculated the insurance rates for partners at $220 per hour, and for associates at $170 per hour. We have previously provided you with the partners and associates of Valle & Associates, and have gone through the invoices as well to apply the insurance rates for a total of $168,805.50. Per our June 13th correspondence, and your July 16th email, there should be a satisfaction of the deductable amount of $100,000. Please subtract that amount from the finalized invoice amount.

Additionally, Garrison Law Corporation has been working within the insurance rates as reflected on our invoices. The costs associated with Garrison Law Corporation's defense on this matter, after calculating the partner versus associate time, equals $85,493.

Plaza Linda Vista
Suite 100   1525 State Street   Santa Barbara, California 93101
*Phone* (805) 957-1700   *Fax* (805) 957-1709
glc@garrisonlawcorp.com

These attorney fees are hereby tendered and are ready for immediate reimbursement to our office in care of the client.

## Expert's Fees

In your July 29th letter you request information on both the plaintiff's and defendants experts who have been retained for trial. The plaintiff's expert is Wayman Gore. Mr. Gore has been deposed and will testify as to the elements in the complaint regarding liability, causation, documentation, and amount of damages in relation to the defendant's actions.

The defendant's have retained two experts, Gregg Perkin and Colin Johns. Both have been deposed and have gone through the voluminous documents contained in the IKON production that has been supplied to AIG through this office.

The defendant's experts will refute and mitigate the testimony of the plaintiff's expert, Mr. Gore. Both of the defendant's experts have executed invoices for their services. Mr. John's invoice totals $45,531.66, and Mr. Perkin's invoices total $158,056.90. The expert's invoices are enclosed herewith to be tendered and reimbursed as defense costs.

After adding the attorney's and expert's fees, and applying the $100,000 deductible, the total amount equals $357,887.06. Please remit payment for these defense costs to our office immediately.

Sincerely,
**Garrison Law Corporation**

Gregg Garrison, R.E.A. & C.E.I.
Attorney at Law

# EXHIBIT "9"

# GARRISON LAW CORPORATION

August 15, 2008

*Via U.S. Mail & Email*

McCurdy & Fuller
Mrs. Mary McCurdy, Esq.
4300 Bohannon Drive, Suite 240
Menlo Park, CA, 94025
Telephone: (650) 618-3500
Facsimile: (650) 618-3599

**Re:    Tender of Defense Costs & Reimbursement Demand for Claim Number 182-093161**

Dear Mrs. McCurdy

Thank you for your letter regarding Greka's insurance claim for attorney's and expert fees under their AIG policy that is associated with the *Wells Fargo Bank, et al. v. Vintage Petroleum* case. Pursuant to our recent teleconference and correspondence, our office has worked with AIG in good faith and has provided AIG with access to the IKON files to assist the investigation and defense of the claim made.

This letter is formal written notice of Greka's tendering of defense costs associated with the claim. Enclosed herewith are the attorney's fees from Sanger & Swysen that have been undertaken by Greka in defense of the litigation. Greka demands immediate payment of these defense costs.

### Attorney's Fees

Per your July 29th letter we have calculated the insurance rates for partners at $220 per hour, and for associates at $170 per hour. We have previously provided you with the partners and associates of Sanger & Swysen, and have gone through the invoices as well to apply the insurance rates for a total of $52,171.

For purposes of receiving a minimum payment to reimburse our client in the interim, we have provided you with the numbers you agreed to pay in your July 29th letter. However, we specifically reserve our right to revisit the issue of attorney's and expert fees that are covered in the policy, and do not waive any rights by agreeing to accept an immediate payment of defense costs.

These attorney fees are hereby tendered and are ready for immediate reimbursement to our office in care of the client.  Please remit payment of $52,171 for these defense costs to our office immediately.


Sincerely,
**Garrison Law Corporation**

Gregg Garrison, R.E.A. & C.E.I.
Attorney at Law